**A.M. CAPEN'S CO., INC., Plaintiff,**

v.

**AMERICAN TRADING AND PRODUCTION CORPORATION, Defendant.**

**A.M. CAPEN'S CO., INC., Plaintiff,**

v.

**BLAS ROSSY–ASENCIO, et al., Defendants.**

Civ. Nos. 94–1367(DRD), 94–1483(DRD).

United States District Court, D. Puerto Rico.

July 11, 1997.

---

Philip E. Roberts, San Juan, PR, for A.M. Capen's Co. Inc., Plaintiff.

Jose E. Colon–Santana, Hato Rey, PR, American Trading and Production Corporation, for Defendants Blas Rossy–Asencio and Rafaela Fulana De Tal.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

A.M. Capen's Co. filed the complaint in this diversity case alleging that the American Trading and Production Co. (ATAPCO) violated the Puerto Rico Dealer's Act, Act No. 75 of June 24, 1964, P.R. Laws Ann. tit. 10, §§ 278–278d (Official translation 1976 & Supp.1991). There are three motions pending before the Court. The plaintiff filed a cross motion for partial summary judgment on the issue of liability.[1] The defendant filed a motion for partial summary judgment on the issue of damages.[2] Finally, the plaintiff filed a motion for reconsideration of the Court's order requiring plaintiff to produce its financial records for the post-impairment period.[3]

Little need be said regarding the motion for partial summary judgment on the issue of liability. Because the defendant's opposition fails to comply with Local Rule 311.12, the plaintiff's statement of uncontested facts is deemed admitted. *See Dominguez v. Eli Lilly & Co.*, 958 F.Supp. 721, 727 (D.P.R. 1997). The admitted facts establish both that a contract granting A.M. Capen's an exclusive dealership for certain ATAPCO products had existed since June 6, 1978, and that on December 14, 1993, ATAPCO unilaterally withdrew A.M. Capen's' exclusivity, in breach of the 1978 agreement. Furthermore, the defendant has failed to produce

---

1. The plaintiff's cross-motion for partial summary judgment on the issue of liability is at Docket No. 16 and the defendants' motion in opposition is at Docket No. 23. The plaintiff later submitted a motion supplementing its earlier motion. Docket No. 56. The motion has not been resolved because on December 29, 1995, by order endorsed on Docket No. 56, the Court stayed its decision on the matter pending the result of an interlocutory appeal that had been taken from the Court's order issuing a preliminary injunction in this case. The stay was automatically lifted when the court of appeals affirmed this Court's order on January 18, 1996. *A. M. Capen's Co. v. American Trading & Prod. Corp.*, 74 F.3d 317 (1st Cir.1996).

2. The defendants' motion for partial summary judgment on the issue of damages is at Docket No. 76, the plaintiff's motion in opposition is at Docket No. 78, and the plaintiff's statement of facts and law in controversy is at Docket No. 79. The plaintiff also submitted a second memorandum of law on the issue of damages in impairment cases, at Docket No. 83, and the defendant submitted an expert opinion prepared by a financial consultant at Arthur Andersen, LLP, on accounting and financial principles that could help to calculate damages in impairment cases, at Docket No. 84.

3. The plaintiff's motion for reconsideration is at Docket No. 80.

any evidence that would justify the finding of "just cause," for purposes of Act No. 75, to impair the distribution relationship. The Court therefore finds that ATAPCO is liable under Act No. 75 for any damages that A.M. Capen's may have suffered as a result of its loss of exclusivity.

The more difficult problem before the Court is determining how to compute damages under Act No. 75 in cases in which the principal has impaired but not terminated the distribution relationship. In its opposition to ATAPCO's motion for partial summary judgment, A.M. Capen's argues that Art. 3 of Act No. 75 requires that damages be granted pursuant to the factors therein enumerated, without exception. For the reasons discussed below, the Court rejects the plaintiff's proffered interpretation and holds instead that under Act No. 75 a plaintiff may only recover actual, proven damages, and therefore that the provisions of Art. 3 are only guides intended to facilitate the Court's task of determining the actual damages suffered by a plaintiff. The court also denies the plaintiff's motion for reconsideration because evidence of the plaintiff's post-impairment sales of ATAPCO products will be relevant to the determination of the damages A.M. Capen's is entitled to receive.

Nevertheless, the Court also denies ATAPCO's motion for partial summary judgment. ATAPCO argued that the plaintiff would not be able to establish having suffered damages, and therefore requested that the complaint be dismissed. The Court finds, however, that the deposition testimony submitted by the plaintiff is sufficient to create a genuine issue of fact as to whether ATAPCO's decision to name a sales agent in A.M. Capen's' exclusive territory entitles A.M. Capen's to compensation under Act No. 75.

## I. Background

On June 6, 1978, John F. Cornforth, General Sales and Marketing Manager for Globe–Weis (a division of Sheller–Globe Corp.), sent a letter to Camilo Fernandez, president of A.M. Capen's Co., stating that "[c]onfirming my phone conversation with you [Fernandez] today, effective immediately you will become our exclusive representative for the sales of our standard Globe–Weis products to Puerto Rico, the Caribbean area, Dominican Republic and Central and South America." Docket No. 16, Ex. 1. The letter also contained various terms of agreement, such as prices, commissions, and shipping procedures.

The relationship between Globe–Weis and A.M. Capen's Co. continued over the next fifteen years; although the Globe–Weis division was purchased by ATAPCO from Sheller–Globe Corporation in 1987, A.M. Capen's' distribution of Globe–Weis and Steelmaster products continued as before. Indeed, an ATAPCO officer, Mr. Dan Hirshhorn, sent A.M. Capen's a letter dated January 7, 1992, stating that it was ATAPCO's intention to take measures to "strengthen this relationship" and "protect the exclusivity of your [A.M. Capen's'] territory." Docket No. 16, Exhibit 7. There is also evidence that A.M. Capen's' annual sales of ATAPCO products were substantial; for example, such sales exceeded $1,000,000.00 for two consecutive years (1992—1993). Docket No. 16, Exs. 10–11.

In July, 1992, Mr. Hirshhorn was replaced by Mr. Michael McNamara as Director of International Markets. A year and a half later, on December 14, 1993, Mr. McNamara wrote Mr. Fernandez to inform him that A.M. Capen's' exclusivity was being withdrawn. The letter, in pertinent part, states that:

> While we feel very good about what your organization has been able to accomplish over the years in these markets [Caribbean and Central America], we also are convinced that the way we have structured our business relationship has served as a restriction to growth and a self-imposed limit to access of important markets. Your business is valuable to us and we want our good relationship to continue. At the same time, it is necessary to change our non-contractual arrangement for exclusive market access. Effective January 1, 1994, the Caribbean and Central American Territories will become non-exclusive territories for A.M. Capens [sic].

Docket No. 16, Ex. 9. The Court notes that neither this letter nor, indeed, any other item

in evidence, indicates that ATAPCO considered A.M. Capen's to have failed to hold up its end of the bargain. The battle of the labels began then, with Mr. McNamara referring to A.M. Capen's as a "U.S. based Exporter" and "a top-notch consolidator of branded products," and to the agreement between ATAPCO and A.M. Capen's as a "non-contractual arrangement." Docket Nos. 9, 12, and 16. A flurry of letter-writing ensued, with A.M. Capen's protesting at its deprivation of exclusivity and requesting negotiations, and ATAPCO insisting that the loss of exclusivity would not be damaging to A.M. Capen's. Some attempts were made to settle the dispute, but the parties failed to reach an agreement.

A.M. Capen's then filed the instant diversity[4] suit against ATAPCO under Act No. 75, seeking compensation for the losses it incurred as a result of ATAPCO's unilateral action. Civil No. 94–1367(DRD). When it was later discovered that ATAPCO had named Mr. Blás Rossy–Asencio as its direct sales representative in Puerto Rico, A.M. Capen's filed a second suit, this one against Mr. Rossy–Asencio under Puerto Rico's tort statute, for tortious interference with contract. Civil No. 94–1483(DRD). The two cases were later consolidated.

## II. Personal Jurisdiction

The Court originally harbored some doubts as to the propriety of exercising personal jurisdiction over ATAPCO. As noted above, ATAPCO is based in Missouri and A.M. Capen's is based in New Jersey. Neither one is incorporated, has offices, nor is authorized to conduct business in Puerto Rico.[5] Furthermore, although there is some controversy as to whether ATAPCO had knowledge that some shipments were eventually destined for Puerto Rico, it is undisputed that all shipments from ATAPCO to A.M. Capen's were delivered to locations in New Jersey or Miami, not in Puerto Rico. It was therefore not clear that ATAPCO had "transacted business" in Puerto Rico for purposes of Puerto Rico's long-arm statute, nor did it otherwise seem to have minimum contacts with Puerto Rico.

To the contrary, it appeared that the only way that the Court could conclude that ATAPCO had sufficient contacts with Puerto Rico to justify the exercise of personal jurisdiction was by finding that Act No. 75 applied to the parties' relationship. That was because Art. 3 of the Dealers' Act declares that a violation of the Act is a tort. P.R. Laws Ann. tit. 10, § 278b. Pursuant to Puerto Rico's long-arm statute, P.R. R. Civ. P. 4.7(a)(2), personal jurisdiction may be exercised over a nonresident tortfeasor who has committed a tort in Puerto Rico. P.R. Laws Ann. tit. 32, App. III, R. 4.7(a)(2) (Official translation 1983).[6]

The problem was that the argument for jurisdiction suffered from logical circularity, because while the very applicabil-

---

4. A.M. Capen's Co. is incorporated and has its principal place of business in New Jersey. ATAPCO is incorporated in Maryland. There is some dispute as to whether ATAPCO's principal place of business is also in Maryland, or whether it is instead in Missouri. Either way, there is complete diversity between the parties. 28 U.S.C.A. § 1332(a) (1993).

5. Neither company maintains any sort of physical presence in Puerto Rico. As Mr. Camilo Fernandez testified at the preliminary injunction hearing held on July 6, 1994, before U.S. Magistrate Judge Jesus A. Castellanos, he does travel to Puerto Rico two or three times a year to meet with clients, but most orders he receives from Puerto Rico clients are placed by telephone or fax to his offices in New Jersey. Docket No. 24.

6. Indeed, Act No. 75 and the long-arm statute appear to have always been intended to work hand in hand. Act No. 104 of June 28, 1965, amended Act No. 75 to provide that violations of the Act constitute torts, notwithstanding the fact that such violations seem more akin to breaches of commercial contracts. Not coincidentally, Act No. 104 was enacted on the same day as Act No. 105 of June 28, 1965, which amended P.R. R. Civ. P. 4.7, Puerto Rico's "Long–Arm Statute", to provide for personal service of process in cases in which a party has committed a tort in Puerto Rico. Various commentators have argued that Act No. 104 was enacted precisely in order to permit plaintiffs in Act No. 75 cases to reach out-of-state defendants. *See* Salvador Antonetti–Zequeira, *La medida de los danos bajo la Ley 75*, 58 Rev. Jur. U.P.R. 227, 229 n. 2 (1989); Miguel A. Velazquez–Rivera, *Jurisdiccion y competencia de los tribunales en Puerto Rico*, 48 Rev. Jur. U.P.R. 27, 57–58 (1979); Wendell W. Colon and Ramiro L. Colon, El contracto de distribucion o de agencia comercial, 27 Rev.D.P. 225, 256 (1968).

ity of Act No. 75 to the parties' relationship depended on the fact that a tort had been committed in Puerto Rico,[7] the determination that the breach of the parties' agreement should be analyzed as a tort, rather than as a breach of contract, depended on the applicability of Art. 3 of the Dealers' Act. Admittedly, the U.S. Court of Appeals for the First Circuit, on appeal from an order of this court issuing a preliminary injunction, declared that in view of the evidence available at that time, weighed according to the choice of law principles of the Restatement (Second) of Conflicts of Law, "the law of Puerto Rico *most probably* applies to this hybrid contract/tort action." *A.M. Capen's Co. v. American Trading & Prod. Corp.*, 74 F.3d 317, 323 (1st Cir.1996) (emphasis added). But the Court notes that the court of appeals' choice-of-law determination was explicitly made provisional, and could have been modified in view of later evidentiary developments in this case.

It is undisputed that pursuant to the exclusive distribution agreement between A.M. Capen's and ATAPCO, A.M. Capen's' exclusive territory included not only Puerto Rico but also various countries in the Caribbean, Central America, and South America, for a total of 37 different jurisdictions. It is also undisputed that the December 14, 1993, letter sent by ATAPCO withdrawing A.M. Capen's' exclusivity was not limited to Puerto Rico, but in fact affected the greater part of the territory covered by the agreement. Therefore, had ATAPCO provided evidence that A.M. Capen's' sales of ATAPCO products outside of Puerto Rico were substantially greater than its sales in Puerto Rico, the

Court would have had the opportunity to re-evaluate its earlier answer to the question whether Act No. 75 should be held to apply to the dispute between the parties. It is possible that the re-evaluation of the relevant choice-of-law factors would have led to the conclusion that Act No. 75 did not apply to the parties' relationship, and, therefore, that there was no *in personam* jurisdiction over the defendant.[8]

However, the Court need not reconsider its earlier decision determining that personal jurisdiction was available over ATAPCO. First of all, ATAPCO has continued to litigate this case on the merits without again raising the question of personal jurisdiction or of the applicability of Act No. 75. The Court therefore finds that ATAPCO has waived any affirmative defense it may have had to the Court's exercise of personal jurisdiction. But in any case, it is now evident that ATAPCO has minimum contacts with Puerto Rico insofar as it has "transacted business" in Puerto Rico for purposes of P.R. R. Civ. P. 4.7(a)(1), by appointing co-defendant Mr. Blás Rossy–Asencio as sales representative in Puerto Rico and proceeding to make direct deliveries of merchandise to Puerto Rico.[9] *See Donatelli v. National Hockey League*, 893 F.2d 459, 462 (1st Cir. 1990).

### III. Standard for Summary Judgment

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

7. The Supreme Court of the Commonwealth of Puerto Rico has adopted the conflicts of laws principles announced in the Restatement (Second) of Conflicts of Laws (1971). *A.M. Capen's Co. v. American Trading & Prod. Corp.*, 74 F.3d 317, 320 (1st Cir.1996). Section 145 of the Restatement "provides that in a tort action the law of the state with the most significant relationship to the occurrence and the parties controls." *Id.* at 321 (citation omitted). The fact that Act No. 75 declares that its violation constitutes a tort weighed heavily in the court's determination that the law of Puerto Rico should apply. In comparison, the choice-of-law principles for contract actions contained in Section 188 of the Restatement would require the application of New Jersey or Missouri law. *Id.* at 320–21.

8. *See infra* Part IV.

9. The Court need not decide whether ATAPCO's contacts with Puerto Rico are sufficiently continuous and systematic to justify the exercise of general personal jurisdiction. ATAPCO's deliveries to clients in Puerto Rico are at least sufficient to establish specific personal jurisdiction, and the complaints in both consolidated cases involve claims related to those deliveries. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984).

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Because the U.S. Court of Appeals for the First Circuit has already "expounded this standard and its particulars in a symphony of cases," *Cortes–Irizarry v. Corp. Insular De Seguros,* 111 F.3d 184, 187 (1st Cir.1997), a short overview of the applicable law will suffice. "Since the core purpose of summary judgment is to 'pierce the boilerplate of the pleadings' and examine the parties' proof to determine whether a trial actually is necessary, . . ., the entry of summary judgment is appropriate if (and only if) no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law." *Vega–Rodriguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997) (citations omitted). Thus, "[t]o defeat a motion for summary judgment, the nonmoving party must demonstrate the existence of a trialworthy issue as to some material fact." *Cortes–Irizarry,* 111 F.3d at 187. "In applying this formulation, a fact is 'material' if it potentially affects the outcome of the case," *Vega–Rodriguez,* 110 F.3d at 178, and "genuine" "if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Cortes–Irizarry,* 111 F.3d at 187. In this regard, questions of credibility will normally constitute 'genuine' issues of fact because the "ground rules associated with summary judgment practice 'admit of no room for credibility determinations.'" *Id.* at 192 (quoting from *Greenburg v. P.R. Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987)).

The Local Rules of the U.S. District Court for the District of Puerto Rico add one final wrinkle to the standard for summary judgment, requiring that:

> Upon any motion for summary judgment, there shall be served and filed annexed to the motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried and the basis of such contention as to each material fact, properly supported by specific reference to the record. . . . The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried, properly supported by specific reference to the record.

Local Rule 311.12. The rule further provides that "[a]ll material facts set forth in the statement required to be served by the moving party *shall be deemed to be admitted* unless controverted by the statement required to be served by the opposing party." Local Rule 311.12 (emphasis added).

A fellow U.S. District Judge has christened this the 'anti-ferreting' rule, explaining that it "serves one crucial purpose. It lays out the material facts in dispute clearly for a district court that is swamped with an overwhelming number of civil and criminal dispositive motions" and "prevents 'the recurrent problem of ferreting through the record' and 'the specter of the district judges being unfairly sandbagged by unadvertised factual issues.'" *Dominguez v. Eli Lilly & Co.,* 958 F.Supp. 721, 727 (D.P.R.1997) (quoting *Stepanischen v. Merchants Despatch Transport. Corp.,* 722 F.2d 922, 930–31 (1st Cir.1983)). Furthermore,

> [W]ithout specific references to the Record, the list of uncontested and contested facts does not serve its purpose. The Court would have to continue to ferret through the record, read all the answers to the interrogatories, study all the attached documents, and carefully scrutinize all the depositions for lurking genuine issues of material fact.

*Id.* Accordingly, failure to comply with the anti-ferreting rule can have severe consequences; indeed, as "*Stepanischen* warns . . . [,] the failure to make specific references to the Record 'would, where appropriate, be grounds for judgment against the party.'" *Id.* (quoting *Stepanischen,* 722 F.2d at 931). The Court merely adds that the failure to submit a statement of facts is an even greater violation of the rule than the failure to make references to the record.

## IV. Choice of Law

Earlier in the case, ATAPCO opposed A.M. Capen's' request for a preliminary in-

junction under Act No. 75 by challenging, on choice-of-law grounds, the applicability of Puerto Rico law to the dispute between the parties. In granting the request for a preliminary injunction, the Court made an initial determination that it would likely reject ATAPCO's choice-of-law arguments. ATAPCO unsuccessfully appealed from the order. However, as explained in the Court's subsequent opinion and order, dated September 3, 1996, neither the injunction order nor the decision of the Court of Appeals were final and binding on the issues of applicable law and liability because they were merely concerned with the Court's prediction of the plaintiff's probability of success on the merits. Docket No. 81 at p. 4.

As suggested above in Part II, the Court might have been willing to hear arguments that it should reconsider its initial determination that Puerto Rico law, and Act No. 75 in particular, was applicable to the dispute between ATAPCO and A.M. Capen's. The First Circuit's description of an Act No. 75 action as a "hybrid contract/tort action" may be subject to misinterpretation, insofar as it could be taken to indicate that the tort aspects of the cause of action predominate over the contract aspects. To the contrary, the essence of the cause of action appears to be contractual, for it depends on the previous existence of a contract, does not require that the supplier be negligent in order to impose liability, and defines just cause, or the lack thereof, in terms of the distributor's compliance with the provisions of the contract. In addition, the Supreme Court of Puerto Rico has often evaluated Act No. 75 actions under the precepts of the Commerce Code. *See, e.g., Pacheco v. National Western Life Ins., Co.,* 122 P.R. Dec. 55 (1988) (declaring that violation of Act No. 75 is an illicit contractual act, not an illicit extra contractual act, and therefore deciding that the Commerce Code, not the Civil Code, provides the tolling rules for Act No. 75's statute of limitations).

In comparison, the tortious aspects of an Act No. 75 cause of action seem contingent. Indeed, the argument can be made that the only reason why the Puerto Rico Legislative Assembly declared that a violation of Act No. 75 was tortious in nature was exclusively to subject violators to service of process under Puerto Rico's long-arm statute. *See supra* note 6. If so, then there is little that would be inherently tortious about a violation of Act No. 75. It is therefore conceivable that a sufficiently strong finding that the Section 188 factors require the application of New Jersey law, based on a determination that New Jersey was truly the center of gravity for the entire 37–country agreement, could overcome the countervailing pull of the Section 145 factors toward the application of Puerto Rico law.

However, the Court also indicated that "if no new facts are produced as to the issue of liability, the final determination of liability [would] mirror the prediction made when the injunction was issued." *Id.* The time for a final determination of liability is upon us. The plaintiff's motion for partial summary judgment on the issue of liability has been pending since before the Court issued the preliminary injunction, and in order to determine whether there is liability under Act No. 75, the Court must first determine whether Act No. 75 applies.

█ ATAPCO has submitted no new facts or arguments that would require reconsideration of the original finding of the Court that Act No. 75 applies to this case. The only evidence provided by ATAPCO is that A.M. Capen's sales of ATAPCO products in Puerto Rico accounted for 3.5% of A.M. Capen's' total sales for 1993, and for 4% of A.M. Capen's' total sales for the 1989–93 period. Docket No. 84. However, that information is not useful to the evaluation of the Section 188 factors, for it includes data on A.M. Capen's' sales of products from other manufacturers. Instead, the information that would have been more pertinent was the proportion of A.M. Capen's' total sales of ATAPCO products (over the entire 37–country territory) represented by its sales of ATAPCO products in Puerto Rico; that is, the relative importance of the Puerto Rico territory to A.M. Capen's' total sales of ATAPCO products. This information was not provided by the defendant.

To the contrary, the only evidence on this issue was provided by the plaintiff in the form of Mr. Fernández's testimony before

the U.S. Magistrate Judge. Docket No. 24. Mr. Fernández testified that A.M. Capen's' sales of Globe–Weis and Steelmaster products in Puerto Rico amounted to $440,000.00 in 1992, and $423,000.00 in 1993. The Court will take these statements as true, since ATAPCO has not controverted them. It therefore appears that even though Puerto Rico was only one of 37 countries over which A.M. Capen's had the exclusive right to distribute ATAPCO products, the plaintiff's sales of ATAPCO products in Puerto Rico during 1992 and 1993 may have accounted for approximately 44% of its total sales of ATAPCO products. In other words, Puerto Rico was likely A.M. Capen's' most important market for ATAPCO products.

The facts recited above militate against a finding that New Jersey was truly the center of gravity for the distribution contract. Furthermore, as noted in both the Court's injunction order and the Court of Appeals' decision, the section 145 tort factors point strongly toward the application of Act No. 75. The Court therefore determines that the choice-of-law objection to the applicability of Act No. 75 must be rejected.

### V. Applicability of Act No. 75

 There is no remaining controversy as to the facts material to the determination of whether Act No. 75 applies. First, there is no question that under Puerto Rico law, the letter sent by ATAPCO on June 6, 1978, constitutes a valid, binding, and enforceable contract between the parties. The question whether a valid distribution agreement exists, in contrast to the question whether the agreement was breached in a way that violates Act No. 75, is a pure question of contract law. As such, section 188 of the Restatement (Second) of Conflicts of Law, rather than section 145, determines the choice of law. As the Court of Appeals indicated in its earlier opinion in this case, the balance of the section 188 contract factors leans toward the application of New Jersey law. *A.M. Capen's Co.*, 74 F.3d at 321.

 New Jersey has adopted Article 2 of the Uniform Commercial Code, which governs commercial transactions in goods. N.J.

Stat. Ann. § 12A (West 1962) (adopting the Uniform Commercial Code). A panel of the Superior Court of New Jersey, Appellate Division, has held that "dealerships or distributorships are to be treated as sales of goods contracts under the UCC." *Custom Communications Eng'g. Inc. v. E.F. Johnson Co.*, 269 N.J.Super. 531, 538, 636 A.2d 80, 84 (1993). The Appellate Division explained that "although most dealership or distributorship agreements involve more than a mere sale of goods, the sales aspect of the relationship predominates." *Id.* at 539, 636 A.2d 80. However, the applicability of Article 2 does not automatically entail that a distributorship contract is subject to the statute of frauds. That is because the general application of U.C.C. Article 2 covers all transactions in goods, N.J. Stat. Ann. § 12A:2–102, while the statute of frauds is designed for a pure sale of goods, N.J. Stat. Ann. § 12A:2–201. *Id.* at 540, 636 A.2d 80. Therefore, "[b]ecause of the mixed character of many distributorships, the U.C.C.'s statute of frauds may or may not apply in a given case." *Id.*

U.C.C. section 2–201, entitled "Formal requirements; statute of frauds," provides that:

(1) A contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party . . . .

N.J. Stat. Ann. § 12A:2–201. In a case involving exclusive requirement contracts, the U.S. Court of Appeals for the Third Circuit analogized such contracts to distributorships

and held that such contracts satisfy the statute of frauds even when they do not contain an expression of quantity of goods to be sold. *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 679 (3d Cir.1991).[10]

■ Even assuming that the statute of frauds applies to the 1978 agreement, the Court finds that the agreement is enforceable. The letter meets the requirements of U.C.C. section 2-201(1): it meets the requirement that the contract be in writing; it contained all the principal terms governing the parties' relationship; and it was signed by an agent of ATAPCO's predecessor in interest. Section 2-201(2) merely reaffirms this conclusion: if a letter confirming an oral agreement between merchants may be enforced against the recipient, all the more so could it be enforced against the sender. Furthermore, the lack of a quantity term is not fatal, for the reasons expressed above. The same result would follow if the statute of frauds did not apply to the 1978 agreement, because Article 2 imposes no other requirements of form. Therefore, since the 1978 agreement complies with the statute of frauds, it is necessarily valid and enforceable.

ATAPCO's belated attempt to characterize the 1978 letter as a "noncontractual arrangement" is wholly without merit. Examining the defendant's argument in the best light possible, it is a claim that the parties did not intend the 1978 letter to be a binding agreement. Unfortunately for this argument, New Jersey's parol evidence rule, N.J. Stat. Ann. § 12A:2-202, requires that the Court disregard any evidence as to the parties' intent that is extrinsic to the writing itself. The Court merely adds that the wisdom of

the parol evidence rule is particularly evident when the extrinsic 'evidence' sought to be introduced is a letter sent by ATAPCO fifteen years after the original contract was entered into.[11]

■ Second, A.M. Capen's falls within the definition of 'dealer' provided by Art. 1 of Act No. 75:

(a) Dealer: person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service.

P.R. Laws Ann. tit. 10, § 278(a) (Official translation 1976 and Supp.1991). The Supreme Court of the Commonwealth of Puerto Rico has stated that:

In order to determine if one is faced with a 'distributor,' one should take into consideration various factors, among them: whether the 'distributor' carries out an active promotion and/or closing of contracts; whether it acquires inventory; whether it exercises control over prices; whether it has discretion with regards to the terms of the contracts for sale; whether it has responsibility for the delivery of merchandise and collection of payments due, and authority to grant credit; whether it takes steps to publicize, either independently or jointly; whether it has assumed the risk and responsibility for the enterprise; whether it purchases the product; and whether it owns or controls physical facilities and offers services related to the product to his or her clients. Other criteria may be added to these, without it being

---

**10.** The Court of Appeals suggested that section 2-201's quantity requirement "should be construed so that the contract is not enforceable beyond the quantity shown in the writing—if a quantity is specified. If no quantity is mentioned, the omission should not be fatal." *Advent Sys. Ltd. v, Unisys Corp.*, 925 F.2d 670, 677 (3d Cir.1991) (citing with approval Bruckel, *The Weed and the Web: Section 2-201's Corruption of the U.C.C.'s Substantive Provisions—The Quantity Problem*, 1983 U. Ill. L.Rev. 811 (1983)).

**11.** Out of an abundance of caution, the Court notes that the same results would obtain under Puerto Rico law. First, Puerto Rico law also subjects commercial agreements to few requirements of form. Art. 82 of the P.R. Commerce

Code, which is a close analog to the statute of frauds, provides that the existence of a commercial contract whose value exceeds $300 may not be established by testimonial evidence, unless such declarations are accompanied by non-testimonial evidence. P.R. Laws Ann. tit. 10, § 1302 (Official translation 1976). This requirement may be easily met by producing a writing, such as a letter, confirming the terms of an agreement. Second, Puerto Rico's parol evidence rule, P.R. R. Evid. 69(b), would also bar consideration of ATAPCO's claim that the 1978 letter was not intended to be a contract. P.R. Laws Ann. tit. 32, App. IV, R. 69(b) (Official translation 1983).

understood nor pretended that an exhaustive list has been established.... No criterion is determinative by itself and none has greater weight or importance than any other. The factors existing in each case must be examined and pondered in conjunction in order to determine whether we are faced with a 'distributor' protected under Act No. 75.

*Roberco, Inc. & Colón v. Oxford Indus., Inc.,* 122 P.R. Dec. 115, 131–32 (1988) (translation ours). Many, if not all, of these factors are present in this case. A.M. Capen's carried out promotional activities for Globe–Weis and Steelmaster products and made frequent appearances at trade shows to meet existing and potential clients. A.M. Capen's bought and resold ATAPCO products. Pursuant to the distribution agreement, after A.M. Capen's placed orders for such products, the risk of loss would pass from ATAPCO to A.M. Capen's when the products were delivered to freight consolidators in New Jersey or Miami hired by A.M. Capen's. In sum, A.M. Capen's is a dealer for purposes of Act No. 75.

Third, the contract between ATAPCO and A.M. Capen's established a prototypical distribution relationship covered by the Act. Article 1 of the Act defines "Dealer's Contract" as follows:

(b) Dealer's Contract: relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

P.R. Laws Ann. tit. 10, § 278(b) (Official translation 1976). The 1978 agreement provided that A.M. Capen's would be the exclusive distributor of Globe–Weis products in all of the Caribbean, Central America, and South America. Puerto Rico was part of this exclusive territory. The Court is compelled to conclude that the relationship established between ATAPCO and A.M. Capen's by the 1978 letter is a dealer's contract for purposes of Act No. 75.

## VI. Liability under Act No. 75

In opposing the plaintiff's motion for partial summary judgment, ATAPCO failed to submit a statement of facts controverting the plaintiff's statement of uncontested facts, as required under Local Rule 311.12. Docket No. 23. The Court therefore deems ATAPCO to have admitted the material facts set forth in the plaintiff's statement of facts not in controversy. Docket No. 16. These facts are that since 1978, A.M. Capen's has been the exclusive distributor of Globe–Weis and Steelmaster brand products in Puerto Rico; that since 1987, ATAPCO has been the manufacturer of Globe–Weis and Steelmaster brand products; that in a letter dated December 14, 1993, ATAPCO unilaterally canceled A.M. Capen's' exclusive distributorship of Globe–Weis and Steelmaster products in Puerto Rico; and that ATAPCO has appointed or permitted Mr. Rossy–Asencio to sell Globe–Weis and Steelmaster products in Puerto Rico.

### A. Impairment of the Established Relationship

ATAPCO did not terminate A.M. Capen's' distributorship, but instead only appointed a sales agent in Puerto Rico, in violation of the exclusive dealing agreement between the parties. ATAPCO's violation of the agreement would not have been actionable under the original version of the Act, which provided only that "no principal or grantor may terminate [a distribution relationship covered by the Act] or refuse to renew said contract on its normal expiration, except for just cause." Art. 2, Act No. 75 of June 24, 1964, 1964 P.R. Laws 232 (Butterworth official translation). However, the Puerto Rico Legislative Assembly apparently became concerned that the statutory language would be interpreted too narrowly, and therefore amended the Act in 1966 to extend its protection to dealers whose distributorships had merely been impaired, rather than terminated outright. Act No. 105 of June 23, 1966, 1966 P.R. Laws 347–50 (Equity). As the Report of the House Industry and Commerce Committee indicates, the 1966 amendment was intended to:

[E]stablish with absolute precision that the law covers not only the case of a distributor completely dispossessed of the distribution of a product without just cause, but also any situation in which a line of distribution is undermined; that is, for example, when the line consists of various products, and the distributor is deprived of a part of that line, or when instead the distributor keeps the entire line, but shipments [of products] are drastically reduced. There are many situations of this nature that may arise, and against which, it must be made clear, the law offers protection. It would not be possible to enumerate them all.

*P.R. Legislative Service,* Vol. 4, No. 4, p. 638 (August 24, 1966) (translation ours). The amended text of Art. 2, which remains in effect, provides in pertinent part that "no principal or grantor may directly or indirectly perform any act *detrimental* [12] to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." P.R. Laws Ann. tit. 10, § 278a (Official translation 1976) (emphasis added).

■■■ "Although what constitutes a termination for purposes of the statute may be clear, the statute provides little guidance as to what constitutes an impairment." Carlos A. Rodriguez–Vidal, *The Concept of Just Cause for the Lawful Termination of a Dealership Under the Dealer's Contracts Law of Puerto Rico,* 58 Rev. Jur. U.P.R. 261, 265 n. 14 (1989). Yet some cardinal principles are fixed. Thus, on the one hand, not every change in the relationship constitutes an impairment. *See, e.g., J. Soler Motors v. Kaiser Jeep Int'l,* 108 P.R. Dec. 134 (1978) (principal's assignment of its rights under the dealership agreement to another corporation did not impair the relationship).

■■■ On the other hand, the appointing of an additional distributor in the original distributor's exclusive territory constitutes an impairment of the established relationship for Act No. 75 purposes. By means of Act No. 81 of July 13, 1988, the Legislative Assembly amended the Dealer's Act to add a new Art. 2A, which provides in pertinent part that:

(b) It shall be presumed, but for evidence to the contrary, that a principal or grantor has impaired the existing relationship in any of the following cases:

(1) [w]hen the principal or grantor establishes facilities in Puerto Rico for the direct distribution of merchandise or the rendering of services which were previously in the charge of the dealer;

(2) when the principal or grantor establishes a distribution relationship with one or more dealers for the area of Puerto Rico or any part of said area in conflict with the contract existing between the parties.

P.R. Laws Ann. § 278a–1 (Official translation Supp.1991). The fact that this new section was expressly made non-retroactive could be interpreted to support the view that the invasion of exclusive territory did not constitute "impairment" prior to the date of effectiveness of the 1988 amendment. However, the better interpretation, and the one adopted by the Court, is that the 1988 amendment did not establish new law, but instead only codified the unbroken line of judicial decisions determining that a principal's interference with its distributor's exclusive territory constituted impairment for Act No. 75 purposes. *See, e.g., General Office Prods. Corp. v. Gussco Mfg., Inc.,* 666 F.Supp. 328, 331 (D.P.R. 1987); *cf. Vulcan Tools of P.R. v. Makita U.S.A., Inc.,* 23 F.3d 564, 568–69 (1st Cir. 1994) (recognizing that naming additional distributors in a distributor's exclusive territory would constitute 'impairment').[13] *See also* Arturo Estrella, *El contrato de agencia o representacion comercial,* 31 Rev. Col. Ab. P.R. 241, 251 (1970) (principal impairs rela-

---

12. The original Spanish term for which "detrimental" is a translation is "menoscabo," which can also be translated as "impairment," "diminution," "deterioration," or "undermining."

13. Of course, "Law 75 does not operate to convert non-exclusive distribution contracts into exclusive distribution contracts.... [T]he 'established relationship' between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually acquired rights." *Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc.,* 96 F.3d 10, 14 (1st Cir.1996) (quoting from *Vulcan Tools,* 23 F.3d at 569).

tionship by naming a second distributor to the exclusive territory of the original distributor); Colon & Colon, *supra* note 6, at 257 (same). Therefore, even though Art. 2A apparently does not apply to the case at hand, because the 1978 agreement antedated the 1988 amendment, the result remains the same.

■ The Court finds that ATAPCO signaled its intention to impair its relationship with A.M. Capen's by sending the December 14, 1993, letter declaring that A.M. Capen's would no longer be the exclusive distributor of Globe–Weis products in the Caribbean and Central American territories, and that ATAPCO effectively impaired the relationship by naming Mr. Rossy–Asencio as a sales agent in Puerto Rico, which theretofore had been part of A.M. Capen's' exclusive territory. Liability will lie, therefore, if ATAPCO had no just cause to impair the relationship.

### B. Without Just Cause

The remaining question as to liability is whether the defendant had just cause to impair the relationship. Act No. 75 defines "just cause" as either "nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on [the dealer's] part that adversely and substantially affects the interest of the principal or grantor in promoting the marketing or distribution of the merchandise or service." P.R. Laws Ann. tit. 10, § 278a (Official translation 1976). In addition,

14. The court of appeals was referring to *Medina & Medina v. Country Pride Foods, Ltd.*, 858 F.2d 817, 822–23 (1st Cir.1988) (containing English translation of response by P.R. Supreme Court, at 122 P.R. Dec. 172 (1988), to question certified in 825 F.2d 1 (1st Cir.1987)), holding that the withdrawal of a principal from the Puerto Rico market after the failure of good faith negotiations may constitute just cause for termination if the principal gives sufficient advance notice of the withdrawal and does not attempt to take over the distributor's clients or market. Subsequent to *Medina & Medina*, there has been a lively debate in the University of Puerto Rico's law review as to which circumstances, in addition to the ones enumerated in the statute, may constitute just cause. *Compare* Carlos A. Rodriguez–Vidal, *The Concept of Just Cause for the Lawful Termination of a Dealership under the Dealer's Contracts Law of Puerto Rico*, 58 Rev. Jur. U.P.R. 261 (1989) (disapproving of the decision in *Medina & Medi-*

Although Law 75, by its plain terms, makes the 'just cause' inquiry turn solely on the dealer's actions or omissions, . . ., the Puerto Rico Supreme Court has read a 'third' 'just cause' into the statute to avoid constitutional invalidation, by holding that a principal's own circumstances may permit its unilateral termination of an ongoing dealership, irrespective of the dealer's conduct.

*R.W. Int'l Corp. v. Welch Foods, Inc.*, 88 F.3d 49, 52 (1st Cir.1996). Whether any other circumstances, in addition to the three just mentioned, may constitute just cause is an undecided matter.[14]

■ The case at hand, however, does not present particularly difficult questions regarding the interpretation of 'just cause' because the defendant has essentially defaulted on the issue. The U.S. Court of Appeals for the First Circuit has held that although an Act No. 75 plaintiff bears the burden of proof on the ultimate issue of liability, "once a dealer demonstrates that its principal unilaterally terminated their contract, the principal must carry the *burden of persuasion* on the factual elements of the 'just cause' showing." *R.W. Int'l Corp.*, 88 F.3d at 52 (emphasis added). *See also Newell P.R., Ltd. v. Rubbermaid, Inc.*, 20 F.3d 15, 22 (1st Cir.1994); *La Playa Santa Marina, Inc. v. Chris–Craft Corp.*, 597 F.2d 1, 4 (1st Cir.1979).[15]

■ In the case at hand, A.M. Capen's has moved for summary judgment and pro-

*na* and favoring instead an interpretation of just cause strictly limited to the terms of the statute), *with* Salvador Antonetti–Zequeira, *A Different Opinion About 'Just Cause,'* 58 Rev. Jur. U.P.R. 625 (1989) (defending the decision in *Medina & Medina* and arguing in favor of a flexible, open-ended interpretation of just cause).

15. The Court notes that the only decisions on point have been rendered by federal courts. The Puerto Rico Supreme Court has never ruled on the precise question whether the defendant bears the burden of persuasion or of production on the issue of just cause. Nevertheless, even if the Puerto Rico Supreme Court were to declare that Act No. 75 defendants only bear a burden of producing evidence of just cause, the result in this case would remain unaffected because ATAPCO has failed to carry even that burden.

vided evidence that ATAPCO unilaterally terminated its exclusivity. Because ATAPCO has the burden of persuasion on the issue of just cause, in order to defeat the motion, ATAPCO must come forward with competent evidence that would create a genuine issue as to whether A.M. Capen's failed to comply with one of the essential obligations of their agreement, or acted in a way that substantially and adversely affected ATAPCO's interests. In fact, ATAPCO has failed to even articulate a legitimate reason for its actions, let alone produced any evidence. The Court therefore determines that ATAPCO had no just cause, as defined under Act No. 75, to deprive A.M. Capen's of its exclusivity.[16]

## VII. Damages under Act No. 75

In its motion for partial summary judgment, ATAPCO contends that because "the compensation formula under Law 75 was designed for termination or cancellation of a contract ... it is not applicable to the case at bar," and therefore that "Capen's recoverable damages are to be measured by the losses, if any, of profits from January, 1994, to June, 1995, due to the impairment of the contract." Docket No. 76. ATAPCO further argues that the complaint should be dismissed because A.M. Capen's has allegedly failed to present any evidence of having suffered any losses during the period in question.

In turn, A.M. Capen's disputes every point raised by the defendant. The plaintiff claims that the damages formula found at Art. 3 of Act No. 75 is mandatory and that it requires that the Court grant the plaintiff, *inter alia*, compensation equal to the profits it made during the five years ending on 1993 from the sales in Puerto Rico of Globe–Weis and Steelmaster products. A.M. Capen's has also submitted evidence of consequential damages resulting from ATAPCO's decision to cancel A.M. Capen's' exclusivity.

Both parties are partly correct and partly incorrect: there is no legal support for the defendant's contention that the factors enumerated in section 278b are never applicable to impairment cases, but there is also no

legal support for the plaintiff's insistence that damages must always be awarded pursuant to each and every one of the factors enumerated in section 278b, regardless of whether the distribution relationship was terminated or merely impaired. The Court first lays out the principles that govern awards of damages under Act No. 75.

### A. Calculation of Damages under Act No. 75

ATAPCO's argument that the damages provisions of Act No. 75 are inapplicable to impairment cases is untenable if taken as a general statement about impairment cases. First, by its terms, Art. 3 of Act No. 75 specifically provides that "[i]f no just cause exists for the termination of the dealer's contract, *for detriment to the established relationship,* or for the refusal to renew [the] same, the principal shall have executed a tortious act against the dealer, and shall indemnify it to the extent of the damages caused him, the amount of such indemnity to be fixed on the basis of the following factors...." P.R. Laws Ann. tit. 10, § 278b (emphasis added). Second, as the plaintiff has argued, the fact that the Puerto Rico Legislative Assembly failed to amend the damages formula for Act No. 75 at the time that the Act was amended to provide for liability in cases of impairment suggests that the Assembly intended the formula to apply to impairment cases. Docket No. 83, at 2–4.

That Art. 3 applies to impairment cases does not, however, entail the automatic application of each of its factors. Any discussion of this matter must begin with the Supreme Court of the Commonwealth of Puerto Rico's succinct statement of the law as to damages under Act No. 75:

> [E]vidence of the damages sustained is an essential requirement. As in all actions of this nature, the burden of proving damages falls on the plaintiff ... *The factors listed [in Art. 3 of Act No. 75] were only guidelines for the fixing of damages and do not bind the court to automatically award indemnity applying each and every*

---

16. In fairness to ATAPCO, the thrust of its argument has always been that there was no contract.

However, the Court has disposed of this argument above at Part V.

*factor. The Court has the discretion to apply the factors listed in the light of the specific circumstances of each case,* pursuant to the evidence presented. Of course, the indemnity can never have a punitive character because, as it is known, said type of damages do not exist in this jurisdiction. *Marina Indus., Inc. v. Brown Boveri Corp.,* 114 Official Translations of the Opinions of the Supreme Court of Puerto Rico 86, 118, 114 P.R. Dec. 64, 90 (1983) (emphasis ours). The quote is self-explanatory, and resolves the matter conclusively.

Even so, A.M. Capen's continues to insist that the section 278b factors are mandatory. A.M. Capen's bases much of its argument on *Pan American Computer Corp. v. Data Gen. Corp.,* 562 F.Supp. 693, 698 (D.P.R.1983), in which the District Court stated that "Law 75 provides that if a principal terminates or refuses to renew a dealership contract without just cause ... the principal must indemnify the dealer pursuant to a statutory formula spelled out in Section 278(b) of Law 75." To place this statement in its proper context, the District Court was answering the defendant's claim that the damages formula was unconstitutional on its face. The Court notes that the quoted language does not support the plaintiff's arguments; that is, the District Court did not explicitly hold that each and every factor in the damages formula must be applied. Instead, the District Court merely held that the damages formula would be constitutional even if it were interpreted to require the application of all the factors and to exclude the application of the requirement of mitigation of damages. The fact that the District Court cited the *Marina Industrial* decision, which had come out eleven days earlier, supports this interpretation because it suggests that the District Court knew that the Puerto Rico Supreme Court had decided that Art. 3 did not require the automatic application of all the damages factors. *Pan American Computer Corp.,* 562 F.Supp. at 695; *cf.* Antonetti–Zequeira, *supra* note 6, at 231 n. 15 & at 232 ("[I]t is probable that the federal court accepted the defendants' contentions only for purposes of argument, although [the court] did not explicitly state so.") (translation ours).

But even if the plaintiff's interpretation of the *Pan American* decision were correct, it would be to no avail, because the Puerto Rico Supreme Court, and not the federal courts, has the final word on what Puerto Rico law is. *See Arizonans for Official English v. Arizona,* —— U.S. ——, ——–——, 117 S.Ct. 1055, 1073–75, 137 L.Ed.2d 170 (1997) (federal courts may certify unclear questions of state law when authoritative interpretation by state supreme court might avoid federal constitutional problems); *see also Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972) (The Supreme Court "lack[s] jurisdiction authoritatively to construe state legislation.") (citation omitted); *R.R. Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 499–500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941) ("But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination. The last word on the meaning of Article 6445 of the Texas Civil Statutes ... belongs neither to us nor to the district court but to the supreme court of Texas."). Or as a commentator has stated, "[s]tate courts are the authoritative voice as to the meaning of state laws." Erwin Chemerinsky, *Federal Jurisdiction* 689 (2d ed.1994). Given the Puerto Rico Supreme Court's decision in *Marina Industrial,* there is no merit to A.M. Capen's' argument that the Court must automatically grant damages pursuant to each factor in Art. 3.

However, the quoted passage from *Marina Industrial* provides only general guidance for determining how to award damages in cases under Act. No. 75. Some further guidance may be obtained from the context surrounding the Court's statement. The Puerto Rico Supreme Court was responding to a supplier's argument that the damages formula at Art. 3 deprived it of its property without due process of law because it "deprived the trier of fact of the power to fix damages on the basis of the traditional standards acknowledged in our system of law," barring "the consideration of factors such as the dealer's obligation to mitigate the damages and the principal's contribution to the value which the company has acquired" and "dupli-

cat[ing] ... the damages awarded" by "making mandatory the granting of goodwill and lost profits on the basis of the statutory formula." *Marina Industrial*, 114 Official Translations at 117, 114 P.R. Dec. at 89. The Supreme Court disagreed, noting that the supplier's "position is grounded on an erroneous premise: that the fixing of damages is mandatory merely because the wording of Art. 3, *ante*, provides that 'such indemnity *to be fixed* on the basis of the following factors ...' The law should never be construed taking an isolated phrase completely cut out [sic] of its context." *Id.*, 114 Official Translations at 117–18, 114 P.R. Dec. at 90 (emphasis in original). The implication derived from the Puerto Rico Supreme Court's rejection of the appellant's arguments is that the calculation of damages under Act No. 75 is subject to the traditional standards of Puerto Rico law on damages.

The Civil Code provides the relevant standards, for the following reasons. Art. 2 of the P.R. Commerce Code provides, in pertinent part, that "[c]ommercial transactions shall be considered those enumerated in this Code and any others of a similar character." P.R. Laws Ann. tit. 10, § 1002 (Official translation 1976). In view of Art. 2, the Supreme Court has indicated that a dealer's contract is commercial and therefore concluded that "[w]hen a commercial obligation, such as the one emanating from a dealer's contract, is breached, the judicial effect of the breach, which in the case at hand is the right to compensation for damages, continues being commercial because it is an accessory to a primary transaction which is also commercial." *Pacheco v. Nat'l W. Life Ins., Co.*, 122 P.R. Dec. 55, 66 (1988) (translation ours). *See also Candido Oliveras, Inc. v. Universal Ins. Co.*, —— P.R. Dec. ——, 1996 WL 727874, *6 (1996) (citing *Pacheco* ).

 Art. 2 of the P.R. Commerce Code also provides that "[c]ommercial transactions ..., whether they are specified in this Code or not shall be governed by the provisions contained in the same; in the absence of such provisions, by the commercial customs generally observed in each place; and in the absence of both, by those of the common law." P.R. Laws Ann. tit. 10,

§ 1002 (Official translation 1976); *see also Pacheco*, 122 P.R. Dec. at 65. The reference to "the common law" is not to the Anglo–American common law, but rather to the Civil Code, which is the 'common law' in a Civil law jurisdiction. *P.R. Bedding Mfg. Corp. v. Herger*, 91 P.R.R. 503, 507, 91 P.R. Dec. 519, 523 (1964). The Commerce Code does not contain provisions specifically applicable to the determination of damages for the violation of a distribution contract, nor are there any relevant business customs, either. Therefore, in the case of distribution contracts, the Civil Code provides the default rules for the calculation of damages. *See Computec Sys. Corp. v. General Automation, Inc.*, 599 F.Supp. 819, 826 (D.P.R.1984) (reaching the same result but reasoning by way of Civil Code Art. 12, which provides that lacunae in special laws may be supplemented by the general provisions of the Civil Code); *see also* Antonetti–Zequeira, *supra* note 6, at 235. These provisions are uniform across the law of obligations, so that it makes little difference whether recourse is had to the law of contracts or of torts. *Id.* at 235–36.

 The Civil Code provides various background principles relevant to the determination of damages under Act No. 75. The fundamental principle, as the Supreme Court held, is that a plaintiff must prove the existence of damages. *Marina Industrial*, 114 Official Translations at 118, 114 P.R. Dec. at 90. As a corollary, "[a]lthough once the existence of the damage is ... proven its exact valuation need not be established with mathematical certainty, its calculation must at least rest on a reasonable basis and not on mere speculation or guess." *Computec Sys.*, 599 F.Supp. at 827. Similarly, the duplication of damages is impermissible, for punitive damages are not allowed by Puerto Rico law. *Marina Industrial*, 114 P.R. Dec. at 90.

 Claimants must also mitigate damages; that is, "the claimant must take the necessary steps to reduce or contain the damages suffered ... unless the situation is one in which no such amelioration is possible." *Computec Sys, Corp.*, 599 F.Supp. at

828.[17] Therefore, in a case such as the one at hand, a distributor who has lost the exclusive distribution of a product must continue to make reasonable efforts to sell that product, because the amount of compensation is partly based on the difference between the distributor's pre-and post-impairment sales of the product in question.[18]

■ There is no conflict between the Civil Code provisions on damages and the Act No. 75 factors. To the contrary, they complement each other. Thus, Civil Code Art. 1059 provides that upon the breach of an obligation, "[i]ndemnity for losses and damages includes not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize." P.R. Laws Ann. tit. 31, § 3023 (Official translation 1990). In order to recover lost profits, "the claimant must prove that these in fact existed, . . . that they were frustrated because of the debtor's conduct, . . . and that they can be estimated on some reasonable basis that must be provided by the claimant, . . . such as the profits previously made by the claimant in a similar period and circumstances." *Computec Sys.*, 599 F.Supp. at 827 (citations omitted).

■ These provisions parallel those found in Art. 3 of Act No. 75, codified at P.R. Laws Ann. tit. 10, § 278b. Thus, sections 278b(a) and 278b(b) provide compensation for the losses that may be incurred as a result of the termination or impairment of a dealership relationship. Similarly, sections 278b(c) and 278b(d) provide compensation for the loss of the expected future profits that the

dealership would have brought. Section 278b is helpful precisely because it provides a 'checklist' that details the types of damages that may usually be suffered by an unjustly terminated dealer and therefore ensures that a court will not overlook them. As noted by the Supreme Court in *Marina Industrial,* however, section 278b does not exempt an Act No. 75 plaintiff from having to prove damages.

■ Nevertheless, some difficult interpretive questions remain. One problem is that the damages formula contained at Art. 3 of the Act is better suited for termination cases than for impairment cases. As another court has stated,

> Theoretically it is possible that damages could result from the termination of the exclusive aspect of a dealership under section 278b. While there would most likely not be damages under section 278b(a) or (b), because what plaintiff invested to enable it to sell defendant's products would continue to be useful and the continuing relationship would make inventory a gain and not a loss, the other two factors allow for the more abstract damages which are appropriate to this situation. The purpose of clause (d) is to replicate what a dealer would get for the sale of a dealership. Clause (c) compensates the plaintiff for loss of goodwill.

*Draft–Line Corp.,* 781 F.Supp. at 847. Notwithstanding the *Draft–Line* court's predictions as to the probability of success of claims for damages under clauses (a) and (b),

---

**17.** A number of cases have discussed the duty to mitigate damages in the contract law context. *See, generally, Odriozola v. Superior Cosmetic Dist. Corp.,* 116 P.R. Dec. 485, 506–07 (1985); *Valldejuli–Lopez Conjugal Partnership v. Jeronimo Corp.,* 103 P.R. Dec. 127, 134 (1974); *Aponte v. Cortes Express E Insurance Company of P.R.,* 101 P.R. Dec. 31, 36 (1973); *see also Noble v. Corp. Insular de Seguros,* 738 F.2d 51, 54 (1st Cir. 1984). The applicability of the duty to mitigate damages to the Act No. 75 context is based not only on the Court's conclusion that the general principles of Puerto Rico contract law are applicable, but also on the *Marina Industrial* decision, in which the Puerto Rico Supreme Court specifically stated that Act No. 75 plaintiffs have a duty to mitigate damages. 114 P.R. Dec. at 91 ("[A]ppellant did not present evidence as to the actions or omissions of Marina Industrial, Inc. [the

plaintiff], in violation of its obligation to mitigate the damages.").

**18.** The Court notes, however, that "[f]ailure to mitigate is an affirmative defense as a matter of federal procedural law," under Fed.R.Civ.P. 8(c), "as well as Puerto' Rico law." *Jones Conjugal Partnership v. Pineda Conjugal Partnership,* 22 F.3d 391, 400 (1st Cir.1994) (citing *Odriozola,* 116 P.R. Dec. at 506–07); *cf. Marina Industrial,* 114 P.R. Dec. at 91 (noting that the defendant had failed to provide evidence of the plaintiff's violation of the duty to mitigate). Therefore, in the Act No. 75 setting, the burden is on the principal, as the defending party, to prove that the plaintiff distributor failed to comply with the duty to mitigate damages.

the Court refuses to foreclose the introduction of evidence as to those factors because it is conceivable that A.M. Capen's' loss of sales of ATAPCO products was great enough to render useless part of its capital investment, and A.M. Capen's should not be prevented from attempting to establish so.

■ Another question is whether the award of damages under both section 278b(c) and 278b(d) is partly duplicative and therefore impermissible. At least one commentator has so concluded, noting that goodwill is sometimes defined as the difference between the profits received by a distributor and the average profits for the relevant sector of the industry, over the preceding five years. *See* Antonetti–Zequeira, *supra* note 6, at 245–46. The argument is that, insofar as recovery under clause (d) already provides compensation for foregone future profits, it already includes compensation for the portion of those future profits that constitute goodwill. Therefore, the argument concludes, a distributor would be receiving a double compensation for loss of goodwill if it were to receive an award of damages under both 278b(c) and 278b(d). *Id.*

However, two courts have disagreed, holding that there is no problem of duplication. *Pan American Computer Corp. v. Data Gen. Corp.*, 562 F.Supp. 693, 700 (D.P.R.1983) (stating that granting damages under both section 278b(c) and (d) is not duplicative); *Ballester Hermanos, Inc. v. Campbell Soup Co.*, Civ. No. 92–1096(JP), 1993 WL 269656, *6 (D.P.R.1993) (Unpublished opinion) (same). The *Ballester Hermanos* court reasoned that there is no duplication of damages because the recovery under section 278b(d) is for profits already "lost as a result of the termination," while the recovery under section 278b(c) is "for profits to be lost after the termination." 1993 WL 269656 at *6.

The Court declines to follow the lead set by the earlier district court cases. According to the *Ballester Hermanos* court's characterization of the recovery for loss of profits under section 278b(d), clause (d) compensates a plaintiff for the profits it had *already obtained* during the five years prior to the termination, which clearly constitutes an impermissible double recovery. In contrast,

the Court understands clause (d) to rely on past profits only as a way to predict future profits; the compensation, clearly, is only for future profits that were foregone as a result of the principal's actions.

■ On the other hand, the Court is not convinced that the award of goodwill necessarily entails a duplication of damages. The problem of duplication arises only if the accounting method used to determine loss of goodwill includes compensation for loss of profits. The Court will therefore entertain evidence and arguments as to damages under both clauses, but only if the plaintiff proposes an accounting method for loss of goodwill that does not include a loss of profits component.

A third problem is whether a plaintiff's post-impairment profits are relevant to the calculation of damages under Art. 3. Admittedly, one case has held that post-termination evidence as to the plaintiff's profitability is irrelevant to the calculation of damages. *Ballester Hermanos*, 1993 WL 269656 at *7 ("post-termination evidence is not required to prove damages and is in fact not admissible because of its speculative nature."). Similarly, two other cases have held that post-termination evidence as to the principal's or new distributor's profitability was also irrelevant. *See Homedical Inc. v. Sarns/3M Health Care, Inc.*, 875 F.Supp. 952, 954 (D.P.R. 1995); *Telenetworks, Inc. v. Motorola Universal Data Sys., Inc.*, 906 F.Supp. 75, 77 (D.P.R.1995).

However, all three cases are distinguishable from the one at hand. In *Ballester Hermanos*, the defendant sought to introduce evidence that the plaintiff had continued to earn profits on its other lines even after the defendant had terminated their relationship. The District Court excluded such evidence because it lacked probative value with regard to the plaintiff's loss of profits from the *terminated* lines. In both *Homedical* and *Telenetworks*, the defendants objected to the plaintiffs' attempts to introduce post-termination evidence as to the *defendants'* post-termination sales in Puerto Rico. In both cases, the District Court agreed with the defendants, holding that the plaintiffs' contention that the fact that the defendants

were able to sell a certain amount established that the *plaintiffs* would have been able to sell an equal amount was pure speculation.

There are two key elements distinguishing these cases from the one at hand. One is that all three of these cases involve the *termination* of a dealership agreement. In termination cases, the post-termination profits from the distribution of products from the terminated lines are extremely easy to calculate: they are exactly zero. In contrast, the post-impairment profits from the distribution of products from the impaired lines are often going to be greater than zero, even if perhaps less than they would have been *sans* impairment. How much less is, of course, precisely the question that remains to be answered at trial.

 The other distinguishing feature is that the request for post-termination profits in *Ballester Hermanos* was for the plaintiff's profits from lines other than the ones subject to the distribution agreement. In contrast, in the case at hand, the only evidence of post-impairment profits relevant to the determination of loss of profits is the evidence relating to the plaintiff's sale of ATAPCO products. Whether the plaintiff has made a profit or a loss on its other product lines is therefore irrelevant to the determination of damages for loss of profits, although it might be relevant to the determination whether the plaintiff suffered a loss of goodwill.[19]

 In fact, the calculation of the lost profits portion of an award for damages in an impairment case, as compared to a termination case, requires that the Court consider the plaintiff's post-impairment profits on the sales of products from the impaired lines. Thus,

> For instance, if the sales made by the distributor after the infringement show a decline from the trend it was expected to

experience in the future, it can reasonably be assumed that the difference between these two amounts, if within the principal's total post-infringement sales, is the amount of damages caused to it by the principal's illegal acts.

*Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 961 F.Supp. 353, 361 (D.P.R.1997) (citing Antonetti–Zequeira, *supra* note 6, at 257). The trend of profits is determined by reference to the formula at section 278b(d); that is, the profits obtained during the five years prior to the impairing act. This trend is projected five years into the future from the date of the impairing act. Likewise, the evidence of post-impairment profits is used to predict the profits that will be received over the following five years by the dealer from his now-impaired lines. The Court then compares the projection of what profits would have been received by the plaintiff had the impairing act not occurred with the projection of what profits will be received. The difference yields an estimate of the plaintiff's lost profits over the five year-period following the impairing act.

 Finally, there remain the related questions whether the award of damages for loss of profits should be net of expenses or not, and whether the award should be reduced to reflect the distributor's tax liability. The answer to the first question is clear: the award of damages under section 278b(d) is for loss of profits, not for loss of gross income. The official translation for the term "beneficios" is "profits," and in any case, the alternative interpretation would grant a plaintiff an award that would exceed the injury actually suffered.

The second question is more complicated. One commentator has argued that the calculation of damages under section 278b(d) should be based on a dealer's after-tax rather than pre-tax profits. *See* Antonetti–Ze-

---

**19.** The Court notes that evidence as to Mr. Rossy–Asencio's sales of ATAPCO products in Puerto Rico during the period in question will be only partially admissible. On the one hand, such evidence will be irrelevant to the determination of A.M. Capen's loss of profits. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 961 F.Supp. 353, 361 (D.P.R.1997) ("[E]ven in infringement cases, it would definitively be specu-

lative to presume, without sufficient and valid proof to substantiate such an assumption, that all the sales made by the other dealers would have been made by the plaintiff."); *Telenetworks*, 906 F.Supp. at 77 (same); *Homedical*, 875 F.Supp. at 954 (same). On the other hand, such evidence might be relevant to the determination whether A.M. Capen's suffered a loss of goodwill.

queira, *supra* note 6, at 247–48. The Puerto Rico Tax Code specifically provided distributors with the option of deferring the payment of taxes on any award of damages from an Act No. 75 complaint by reinvesting the amounts awarded in their business operations, paying taxes on such funds only when they are withdrawn from the business. P.R. Laws Ann. tit. 13, § 3112(f)(5). The argument was that, because of the favorable tax treatment that awards of damages under Act No. 75 are given, an award based on the distributor's pre-tax profits would place the distributor in a better situation than it would have been in had the termination or impairment never occurred, which would violate the prohibition on punitive damages. *Id.* at 248.

However, at least two reported district court decisions have disagreed with this view. *Ballester Hermanos,* 1993 WL 269656 at *8; *Casas Office Machines,* 961 F.Supp. 353, 358–61. In the latter case, the District Court based the award of section 278b(d) damages on pre-tax profits, remarking that in cases in which the dealer reinvested the award in accordance with section 3112(f)(5), the Puerto Rico Tax Code "simply allow[ed] the deferral of payment of taxes until the dealer decides to extract the company's profits over which it will have to pay taxes, for the same will then be recognized as ordinary income. In other words, 'the tax code provide[d] the dealer with the same opportunity he would have enjoyed had the profits been obtained in the regular course of business.'" 961 F.Supp. at 359 (quoting from *Ballester Hermanos,* 1993 WL 269656 at *8).

The question has been further complicated by intervening legislative action. In 1994, Puerto Rico adopted a new Internal Revenue Code. P.R. Laws Ann. tit. 13, §§ 8001 et seq. (1996). *Among other things, former section 3112(f)(5) was repealed and replaced by new section 8512(f)(5), which contains similar language giving dealers the option of deferring the payment of taxes on awards of damages under Act No. 75, by providing that under certain circumstances such awards will not be recognized as taxable gains.* The crucial difference between the two sections is that under new section 8512(f)(5), a dealer may defer the payment of taxes only on those amounts reinvested in the dealership's property; that is, the amounts reinvested in the dealership's operations do not appear to be eligible for non-recognition. Section 3112(f)(5) contained no such limitation.

The lesser are the tax benefits enjoyed by dealers, the weaker is the case for basing an award of damages under section 278b(d) on the dealer's post-tax profits. Nevertheless, rather than rule upon this issue now, the Court requests that the parties wait until after the trial to submit short briefs discussing whether the calculation of damages under section 278b(d) should be based on the plaintiff's after-tax or pre-tax profits for the five years prior to ATAPCO's impairing acts. The Court could also benefit from the opinions of financial or accounting experts on this particular question.

**B. Motion for Partial Summary Judgment on the Issue of Damages**

As a matter of law, ATAPCO is correct in claiming that a failure to prove damages would be fatal to the plaintiff's complaint. Thus, a court granted summary judgment in favor of an Act No. 75 defendant when the plaintiff failed to produce evidence as to damages, stating that "[f]or this court to construe evidence in favor of plaintiff, it must be given evidence to construe." *Draft–Line Corp. v. The Hon Co.,* 781 F.Supp. 841, 846 (D.P.R. 1991), *aff'd,* 983 F.2d 1046 (1st Cir.1993) (also rejecting the plaintiff's argument that the factors at section 278b(d) would automatically apply). However, ATAPCO is mistaken as a matter of fact.

To defeat the motion for partial summary judgment, the plaintiff must show that there is a genuine issue of material fact as to damages. A.M. Capen's complied, submitting competent evidence to that effect in the form of a portion of the transcript of the testimony of its president, Mr. Camilo Fernandez, given under oath before U.S. Magistrate Judge Jesus Castellanos on July 6, 1994. Docket No. 24. Mr. Fernandez stated that A.M. Capen's' sales of Globe–Weis and Steelmaster products had decreased in the months after Mr. Rossy–Asencio had been appointed sales representative for those products. Docket No. 24 at pp. 99–100. If

believed, this statement would tend to show that A.M. Capen's has suffered a loss of income as a result of ATAPCO's impairment of their relationship. Mr. Fernandez also stated that some of A.M. Capen's' former clients became dissatisfied with their relationship with A.M. Capen's when they found out that if they placed their orders through Mr. Rossy–Asencio, they would not have to pay the freight charges. Docket No. 24 at pp. 131–32. If believed, this statement would tend to show that A.M. Capen's suffered a loss of business goodwill as a result of ATAPCO's impairment of their relationship.

As noted above in Part III, questions of credibility are not amenable to resolution at the summary judgment stage. *Greenburg*, 835 F.2d at 936. Viewing the facts in the light most favorable to A.M. Capen's, as the non-moving party, the Court finds that the statements referred to above are sufficient to create a genuine issue as to whether A.M. Capen's suffered damages as a result of ATAPCO's actions. The motion for partial summary judgment on the issue of damages is therefore denied.[20]

## VIII. Conclusion

For the foregoing reasons, the Court finds that ATAPCO violated Act No. 75 by impairing, without just cause, the exclusive distribution relationship that existed between ATAPCO and A.M. Capen's. The Court also finds that there is a genuine controversy as to whether, and to what extent, A.M. Capen's suffered damages as a result of ATAPCO's actions. However, and contrary to the plaintiff's contention, one of the various factors that the Court will take into consideration in setting damages will be the amount of ATAPCO products sold by A.M. Capen's from December, 1993, to June, 1995. Accordingly, the Court grants the plaintiff's motion for partial summary judgment on the issue of liability, Docket No. 16, denies the defendant's motion for partial summary judg-

ment on the issue of damages, Docket No. 76, and denies the plaintiff's motion for reconsideration of the denial of its motion for a protective order, Docket No. 80.

The Court will therefore hold a bench trial on the issue of damages **on August 26, 1997, at 9:00 a.m.** A status/pretrial conference shall be held in chambers on **August 13, 1997, at 3:30 p.m.** The Court encourages the parties to re-examine their views on settlement, for further discussion at the status conference.

The Court also notes that no dispositive motions have yet been filed by either party as to the complaint against Mr. Rossy–Asencio for alleged tortious interference with A.M. Capen's' distribution contract, even though the case has been pending for approximately three years. Should the parties intend to file any such motions, the same should be filed within the next **twenty** days.

IT IS SO ORDERED.

---

**20.** It bears mentioning that ATAPCO's statement of uncontested facts fails to comply with Local Rule 311.12 because it does not contain specific references to the record. *See supra* Part III. The Court could have deemed A.M. Capen's' statement of contested facts to be admitted. In this case, however, it is immaterial whether or not the statement of contested facts is admitted, since A.M. Capen's is the non-moving party, and as such only needed to meet ATAPCO's statement of facts with a contrary statement, so as to create a controversy that would require the intervention of a fact finder. A.M. Capen's has submitted such a statement, as the Court discussed above.