Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel II

| | | |
|---|---|---|
| HEALTHY AIR MASTERS, INC. Recurrida | KLCE202400719 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de Bayamón |
| v. | | Caso Núm. BY2020CV01598 |
| MOTOPAC CORP. y OTROS Demandados | | Sobre: Interferencia Torticera |
| VITAL TECHNOLOGIES, INC.; VITAL SOLUTIONS, LLC; THE ECOLOGY WORKS, INC. Peticionarios | | |

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Adames Soto y la Juez Aldebol Mora

Adames Soto, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 21 de noviembre de 2024.

Comparecen las codemandadas, Vital Technologies, Inc., Vital Solutions, LLC, y The Ecology Works, Inc., (en conjunto VS o parte peticionaria), mediante recurso de *certiorari,* solicitando la revocación de una *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce, (TPI), el 7 de marzo de 2024. Mediante dicho dictamen el foro primario declaró *Sin Lugar* la *Moción de Sentencia Sumaria por Prescripción* presentada por VS.

La parte peticionaria juzga que el TPI incidió al así decidir, por cuanto la prueba alegadamente incontrovertida demostraba que las causas de acción al amparo de la Ley Núm. 75, *infra,* estaban prescritas. En oposición, Healthy Air Masters, Inc. (HAM o parte recurrida) plantea que su causa de acción fue presentada dentro del término prescriptivo de tres (3) años que establece la Ley Núm. 75, *infra.* En la alternativa, esta

misma parte sostiene que existen hechos en controversia que impiden que se pueda adjudicar por sentencia sumaria la defensa de prescripción.

## I. Resumen del tracto procesal

El 19 de mayo de 2020 HAM presentó *Demanda* contra Motopac Corp. (Motopac) alegando interferencia torticera con relaciones contractuales y daños y perjuicios.

En respuesta, el 16 de noviembre de 2020, Motopac presentó una *Moción Solicitando Desestimación* de la referida *Demanda*, aduciendo que dejaba de exponer una reclamación que justificara la concesión de un remedio, y por dejar de acumular a Vital Solutions, Inc. y/o Vital Technologies, como parte indispensable.

Ante lo cual, el 31 de enero de 2021, HAM se opuso mediante escrito intitulado *Oposición a Moción Solicitando Desestimación*.

Tras varios trámites procesales, el 28 de julio de 2021, HAM presentó una *Demanda Enmendada*, en la que incluyó como codemandadas a Vital Technologies, Vital Solutions, LLC y The Ecology Works, Inc. Alegó, además, que había establecido una relación comercial para la venta y distribución exclusiva del producto Vital Oxide con VS, quien es su manufacturera en el estado de la Florida, Estados Unidos. Agregó que, al inicio de la relación comercial, los productos Vital Oxide no se vendían ni distribuían en Puerto Rico, por lo que, alegó, fue quien estableció el mercado para dichos productos en Puerto Rico. Continuó exponiendo que durante un periodo de 10 años mantuvo con VS la distribución exclusiva de los productos Vital Oxide. Asimismo, esgrimió que entre los años 2018-2019 iniciaron discusiones sobre el establecimiento de una planta de procesamiento y empaque de los productos Vital Oxide en Puerto Rico para facilitar la distribución exclusiva.

En el mismo escrito HAM alegó que, a raíz de la necesidad de productos de limpieza y desinfección que produjo la pandemia del COVID-

19, VS lo contactó para que atendiera la solicitud de compra de Motopac. Sin embargo, aseveró que la referida solicitud nunca se produjo, sino que, en mayo de 2020, advino en conocimiento de una publicidad masiva donde Motopac ofrecía para la venta el producto Vital Oxide. A partir de ello, HAM inició una investigación que confirmó que Motopac adquirió los productos directamente de las codemandadas. Tras solicitar el desistimiento a Motopac, y que esta se negara, fue que radicó la *Demanda*. Añadió que, en su caso, VS había aumentado los precios de los productos Vital Oxide, haciendo que el negocio se tornara en uno impráctico, imposible de absorber y fuera de toda posible competencia, mientras que a Motopac le mantenía precios mucho menores y distintos. Por lo tanto, concluyó que se presume que hubo un menoscabo y/o incumplimiento de la relación existente entre HAM y VS, al VS establecer y conceder una relación comercial de distribución directa con Motopac, mediante la cual autorizó o permitió la venta y distribución de Vital Oxide en Puerto Rico.

Además, HAM sostuvo que el incremento de los precios de venta de los productos Vital Oxide, convirtió la operación comercial en una poco viable o rentable, siendo otro menoscabo de la relación comercial de la distribución exclusiva existente entre esta y se presume que hubo un menoscabo y/o incumplimiento de la relación existente entre las partes. Por último, sostuvo que las actuaciones en menoscabo de la relación de distribución exclusiva y en ausencia de justa causa, hacía responsable a los codemandados por los daños sufridos, incluyendo la pérdida o menoscabo de la plusvalía del negocio producto del desarrollo del mercado, y los esfuerzos invertidos por el periodo de diez años en la promoción, desarrollo del mercado y venta de los productos Vital Oxide en Puerto Rico. Asimismo, en lo que respecta a VS solicitó indemnización por los daños y perjuicios causados por el incumplimiento contractual y dolo a tenor con el Código Civil de Puerto Rico, *infra*.

El 29 de octubre de 2021 Motopac presentó su *Contestación a la Demanda Enmendada,* en la cual levantó como defensa afirmativa, entre otras, la inexistencia de un contrato de exclusividad entre HAM y VS, por lo que no cabía aducir interferencia con contrato alguno.

A su vez, el 9 de diciembre de 2021, VS presentó su *Contestación a Demanda Enmendada y Reconvención,* en la cual alegó que, en marzo del 2015, HAM le solicitó la exclusividad de Vital Oxide para Puerto Rico y que esta le fue conferida, sujeta a incrementos en compras de 10% anuales. Así también, sostuvo que las causas de acción al amparo de la Ley Núm. 75, *infra,* estaban prescritas porque la parte recurrida accedió y acordó la pérdida de la exclusividad en el 2017, por lo que habían pasado más de tres años desde su terminación.

A raíz de ello, el 20 de diciembre de 2021 HAM presentó una *Réplica a la Reconvención.*

Es así como, el 26 de julio de 2022, VS presentó la *Moción de Sentencia Sumaria por Prescripción.* En esta arguyó que el 12 de diciembre de 2017, tres años y medio antes de que HAM presentara la *Demanda Enmendada,* dio por terminada la exclusividad de la relación de distribución del producto Vital Oxide en Puerto Rico que mantenía con dicha demandante. También, sostuvo que en el 2018 le informó a HAM sobre el cambio de precios. Por esto concluyó que, presentada la *Demanda* en su contra el 28 de julio de 2021, las reclamaciones de HAM estaban prescritas, pues se instaron fuera del término de tres años que provee la Ley Núm. 75, *infra,* a partir de los alegados actos de menoscabo. Sobre las causas de acción que también fueron incluidas en la misma *Demanda* al amparo del Código Civil de Puerto Rico, *infra,* aseveró que resultaban improcedentes, porque el único remedio provisto es el que dispone la Ley Núm. 75, *infra,* ley especial que prevalece sobre cualquier otra.

En desacuerdo, el 19 de agosto de 2022, HAM presentó su *Contestación y/u Oposición a Moción de Sentencia Sumaria por*

*Prescripción.* Alegó, en síntesis, que las partes continuaron comportándose como si mantuviesen una relación de distribución exclusiva hasta el año 2020, cuando VS vendió gran cantidad de los productos Vital Oxide a Motopac para su distribución en Puerto Rico, lo que ocasionó la violación a la exclusividad y los daños requeridos en Puerto Rico para poder ejercer la causa de acción al amparo de la Ley Núm. 75, *infra*. Además, señaló el aumento de precios del producto Vital Oxide y el cambio de condiciones impuesto por VS, como una medida en represalia y discriminatoria para sacarlo del mercado de Puerto Rico y entregarle todo el negocio a Motopac.

Así las cosas, el 7 de marzo de 2024, el TPI emitió la *Resolución* cuya revocación nos solicita la parte peticionaria, declarando *Sin Lugar* al *Moción de Sentencia Sumaria por Prescripción.* Allí, luego de identificar una serie de hechos que juzgó incontrovertidos, el foro primario concluyó que los siguientes hechos permanecían en controversia e impedían la resolución del caso por la vía sumaria:

1. Si el 29 de marzo de 2010 HAM y VS comenzaron una relación de distribución para distribuir el producto VO en el mercado de Puerto Rico, mediante al cual HAM le compraba productos a VS para vender y distribuir los mismos en el mercado de Puerto Rico.
2. Si en el año 2015 VS otorgó a HAM el derecho de exclusividad sobre la distribución del producto VO en Puerto Rico, convirtiendo la relación de distribución en una exclusiva en el mercado de Puerto Rico.
3. Si el 12 de enero de 2015 VS y HAM documentaron los términos y condiciones de la relación de distribución, y acordaron que la relación de distribución sería una exclusiva.
4. Si como parte de las negociaciones sobre los términos de la relación, HAM presentó a VS su proyección de ventas para el año 2015, el cual fluctuaría entre 53 y 55 paletas de VO para ese año.
5. Si basados en la proyección de HAM, las partes acordaron que el derecho de exclusividad que ostentaba HAM estaría sujeto a que HAM tuviera un aumento en las ventas de VO de 10% anual, por un periodo de tres años.
6. Si el 12 de enero de 2015 HAM aceptó el acuerdo que condicionaba su derecho de exclusividad sobre el producto VO a un crecimiento de 10% anual en ventas, por un periodo de tres años, ya que entendía que el crecimiento por año acordado era razonable. Específicamente, indicó "I think its right and fair. We feel confidence in the growth per year".
7. Si ratificando el acuerdo que condicionó la exclusividad de la distribución, VS envió a HAM una carta con fecha de 20 de marzo de 2015, de donde surgen los términos del contrato de distribución acordados entre VS y HAM para la distribución del producto VO en Puerto Rico. Si en específico, las partes acordaron que la exclusividad sobre la distribución de VO en Puerto Rico estaría sujeta un crecimiento en las ventas de VO en Puerto Rico de un 10% anual, por un periodo de tres años, basado en la proyección de

ventas provista por HAM. Si en la referida carta, VS específicamente indicó que "[...] with the buying projection agreed on this first year of Vital Oxide in gallons, or its equivalent, provided by Mr. Vicente A. Vales and Ms. Maria Vales of Healthy Air Masters, Inc. at a 10% increase per year with a three year term".

8. Si en compras de más de 10 paletas de VO, el precio sería de once dólares ($11.00) por galón si la compra era a crédito, y de diez dólares ($10.00) por galón, si el pago era por adelantado.

9. Si el 28 de octubre de 2017 HAM solicitó a VS una concesión especial de reducción de precios para una compra de una sola paleta de producto VO, por la situación crítica que atravesaba Puerto Rico, ante el paso del huracán María.

10. Si de buena fe, por entender las circunstancias extraordinarias que atravesaba la isla, VS concedió un precio reducido a HAM de nueve dólares ($9.00) por galón, con la salvedad de que el precio concedido sería por esa única orden de compra. Si a su vez, VS reiteró que el precio concedido era un precio preferencial que no se le otorgaba a nadie en órdenes menores de 10 paletas.

11. Si el 12 de diciembre de 2017 VS, a través del señor Luis Dávalos, informó a HAM, mediante un correo electrónico, que continuarían trabajando juntos, más, sin embargo, "bajo términos de no exclusividad", dando por terminado el derecho de exclusividad de HAM, sobre la distribución de los productos VO, en el territorio de Puerto Rico.

12. Si el 14 de diciembre de 2017 HAM confirmó haber recibido el correo electrónico de VS, dando por terminada la exclusividad en la distribución del producto VO en Puerto Rico, sin presentar objeción alguna. Si al contrario, HAM aceptó que dejasen de ser distribuidores exclusivos e informó que esperaban que la relación volviera a ser "igual o más fortalecida, una vez se demuestren los resultados" de su trabajo.

13. Si desde diciembre de 2017 en adelante, la relación de distribución entre VS y HAM cambió de ser una exclusiva a una no exclusiva, sin objeción alguna por parte de HAM. Si a estos efectos, VS dejó de identificar a HAM como distribuidor exclusivo en las cartas, autorizando a HAM a representar a VS en el mercado de Puerto Rico.

14. Si en el año 2018 cuando la relación de distribución con HAM ya no era exclusiva, VS comenzó a vender el producto VO directamente a clientes en Puerto Rico.

15. Si al 28 de julio de 2021 habían transcurridos más de tres años desde que VS terminó el derecho de exclusividad de HAM para la venta de los productos VO, y de VS haber hecho cambios a la estructura de precios del producto VO.

Inconforme, VS presentó una oportuna *Moción de Reconsideración* ante el tribunal *a quo*, que fue declarada *Sin Lugar*. Por lo cual, la parte peticionaria decidió comparecer ante este Tribunal de Apelaciones, mediante recurso de *certiorari*, señalando la alegada comisión del siguiente error por el foro primario:

Erró el honorable Tribunal de Primera Instancia al emitir su *Resolución* del 7 de marzo de 2024 y negarse a dictar sentencia sumaria a favor de la parte aquí peticionaria, a pesar de que la prueba incontrovertida claramente demuestra que todas las causas de acción aducidas por la parte demandante están fatalmente prescritas.

El 11 de septiembre de 2024 HAM compareció mediante *Oposición a Certiorari.*

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II. Exposición de Derecho**

a.

El propósito de las Reglas de Procedimiento Civil es proveer a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1; *González Santiago v. Baxter Healthcare,* 202 DPR 281, 290 (2019); *Rodríguez Méndez et al. v. Laser Eye,* 195 DPR 769, 785 (2016), *Oriental Bank v. Perapi et al.*, 192 DPR 7, 25 (2014). La sentencia sumaria hace viable este objetivo al ser un mecanismo procesal que le permite al tribunal dictar sentencia sobre la totalidad de una reclamación, o cualquier controversia comprendida en ésta, sin la necesidad de celebrar una vista evidenciaria. J. A. Echevarría Vargas, *Procedimiento Civil Puertorriqueño*, 1[era] ed., Colombia, 2012, pág. 218. Procede dictar sentencia sumaria si "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia si las hubiere, acreditan la inexistencia de una controversia real y sustancial respecto a algún hecho esencial y pertinente y, además, si el derecho aplicable así lo justifica". *González Santiago v. Baxter Healthcare,* supra*; Roldan Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018); *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 225 (2015), *SLG Zapata-Rivera v. J. F. Montalvo*, 189 DPR 414, 430 (2013). A su vez se recomienda, en aquellos casos en que el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012). Por el contrario, "no es aconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o

cuando el factor credibilidad es esencial y está en disputa". *Ramos Pérez v. Univisión,* 178 DPR 200, 219 (2010).

Así, la sentencia sumaria "vela adecuadamente por el balance entre el derecho de todo litigante a tener su día en corte y la disposición justa rápida y económica de los litigios civiles". *Íd.,* a la pág. 220. Por lo tanto, el principio rector que debe guiar al juez de instancia en la determinación sobre si procede o no la sentencia sumaria es "el sabio discernimiento", ya que si se utiliza de manera inadecuada puede prestarse para privar a un litigante de su día en corte, lo que sería una violación a su debido proceso de ley. *Mun. de Añasco v. ASES et al.,* 188 DPR 307, 327-328 (2013); *Cruz Marcano v. Sánchez Tarazona,* 172 DPR 526, 550 (2007); *ELA v. Cole,* 164 DPR 608, 627 (2005); *Roig Com. Bank v. Rosario Cirino,* 126 DPR 613 (1990). Ello, pues la mera existencia de "una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria... cuando causa en el tribunal una duda real y sustancial sobre algún hecho relevante y pertinente". *Pepsi-Cola v. Mun. Cidra et al.,* 186 DPR 713, 756 (2012). Se considera un hecho material y pertinente, aquél que puede afectar el resultado de la reclamación acorde al derecho sustantivo aplicable. *Íd.*; *Ramos Pérez v. Univisión,* supra, pág. 213.

Por otra parte, es esencial reconocer que la Regla 36.3 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3, establece de manera específica los requisitos de forma con los que debe cumplir la parte que promueve la moción de sentencia sumaria, así como la parte que se opone a ella.[1] En lo pertinente, la parte promovente debe exponer un listado de

---

[1] La Regla 36.3 de las de Procedimiento Civil, 32 LPRA Ap. V, R.36.3, requiere que una Moción de Sentencia Sumaria contenga: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación en los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. Por su parte, la contestación deberá cumplir con lo indicado en los números 1 al 3. *Íd.* Además, deberá incluir una relación concisa y organizada, con una referencia a los párrafos enumerados

hechos no controvertidos, desglosándolos en párrafos debidamente numerados y, para cada uno de ellos, **especificar la página o el párrafo de la declaración jurada u otra prueba admisible que lo apoya**. (Énfasis provisto).

A su vez, la parte que se opone a la moción de sentencia sumaria está obligada **a citar específicamente los párrafos según enumerados por el promovente** que entiende están en controversia y, para cada uno de los que pretende controvertir, detallar la evidencia admisible que sostiene su impugnación con cita a la página o sección pertinente. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015). (Énfasis provisto). La parte que se opone no puede descansar exclusivamente en sus alegaciones ni tomar una actitud pasiva. *Toro Avilés v. P.R. Telephone Co.*, 177 DPR 369, 383 (2009). Por el contrario, tiene que controvertir la prueba presentada por la parte solicitante, a fin de demostrar que sí existe controversia real sustancial sobre los hechos materiales del caso en cuestión. *González Aristud v. Hosp. Pavía*, 168 DPR 127, 138 (2006).

Si el promovente de la moción de sentencia sumaria no cumple con los requisitos de forma el tribunal no está obligado a considerarla. *SLG Zapata-Rivera v. J. F. Montalvo*. Así pues, "el método recién implantado coloca sobre las partes, quienes conocen de primera mano sus respectivas posiciones, así como la evidencia disponible en el caso, el deber de identificar cada uno de los hechos que estiman relevantes, al igual que la prueba admisible que los sostiene". *SLG Zapata-Rivera v. J. F. Montalvo*,

---

por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; una enumeración de los hechos que no están en controversia, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal, y las razones por las cuales no debe ser dictada la sentencia, argumentando el derecho aplicable. 32 LPRA Ap. V, R. 36.3.

supra, págs. 433-434. Además, se facilita el proceso adjudicativo al colocar al foro juzgador en posición de evaluar conjuntamente las versiones encontradas para cada hecho refutado a la luz de las referencias a la prueba que alegadamente los apoya. *Íd,* pág. 434. Este sistema agiliza la labor judicial y propende la disposición expedita de aquellas disputas que no necesitan de un juicio para su adjudicación. *Íd.*

A su vez, la aludida Regla 36, *supra*, le exige a la parte oponente examinar cada uno de los hechos consignados en la solicitud de sentencia sumaria y, para todos aquellos que considere que existe controversia, identificar el número del párrafo correspondiente y plasmar su versión contrapuesta fundamentada en evidencia admisible. *Íd.* Por lo cual, resaltamos que "[l]a numeración no es un mero formalismo, ni constituye un simple requisito mecánico sin sentido. Por el contrario, tiene un propósito laudable, por lo que su relevancia es indiscutible y queda claramente evidenciada luego de una interpretación integral de las enmiendas acogidas en el 2009". *Íd.*

c.

En el caso de revisar sentencias del TPI dictadas mediante el mecanismo de sentencia sumaria, o resolución que deniega su aplicación, este Tribunal de Apelaciones se encuentra en la misma posición que el tribunal inferior para evaluar su procedencia. *Meléndez González et al. v. M. Cuebas*, supra, pág. 115. Los criterios a seguir por este foro intermedio al atender la revisión de una sentencia sumaria dictada por el foro primario son:

> 1. examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;
> 2. revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;
> 3. revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y;

4. de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldan Flores v. M. Cuebas*, supra, pág. 679.

Además, al revisar la determinación del TPI respecto a una sentencia sumaria, estamos limitados de dos maneras; (1) solo podemos considerar los documentos que se presentaron ante el foro de primera instancia, y (2) solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González, et al. v. M. Cuebas*, supra. El primer punto se enfoca en que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Mientras que el segundo limita la facultad del foro apelativo a revisar si en el caso ante su consideración existen controversias reales en cuanto a los hechos materiales, pero no puede adjudicarlos. *Íd.* en la pág. 115. También, se ha aclarado que al foro apelativo le es vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. *Vera v. Bravo*, 161 DPR 308, 335 (2004).

d.

En *Next Step Medical v. Bromedicon*, 190 DPR 474, 488 (2014), el Tribunal Supremo estableció que la Ley Núm. 75 de 24 de junio de 1964, Ley de Contratos de Distribución de 1964, 10 LPRA sec. 278 *et seq.*, según enmendada [en adelante, Ley Núm. 75] está incuestionablemente revestida de una fuerte política pública. A su vez, manifestó que "[l]a inclusión del aludido estatuto a nuestro ordenamiento tuvo el propósito de armonizar los intereses y nivelar las condiciones de contratación de dos partes económicamente dispares, que se encuentran vinculadas por una relación de índole comercial que involucra la distribución". *Íd.* Continuó explicando que ello tuvo "el fin de lograr una razonable estabilidad en las relaciones de distribución en Puerto Rico y erradicar ciertas prácticas que, más allá de contribuir con la estabilidad

económica, inciden sobre las expectativas legítimas que las partes vinculadas respectivamente ostentan". *Íd.* Asimismo, incluyó el siguiente fragmento de la Exposición de Motivos de la Ley Núm. 75 en donde queda plasmado el interés público que persigue, a saber:

> El Estado Libre Asociado de Puerto Rico no puede permanecer indiferente al creciente número de casos en que empresas domésticas y del exterior, sin causa justificada, eliminan sus distribuidores, concesionarios o agentes, o sin eliminarlos totalmente van gradualmente mermando y menoscabando el alcance de las relaciones previamente establecidas, tan pronto como dichos distribuidores, y sin tener en cuenta sus intereses legítimos. La Asamblea Legislativa de Puerto Rico declara que la razonable estabilidad en las relaciones de distribución en Puerto Rico es vital a la economía general del país, al interés público y al bienestar general, y en el ejercicio del poder policial, considera necesario reglamentar, en lo pertinente, el campo de dichas relaciones, para evitar los abusos que ciertas prácticas ocasionan. *Íd.* págs. 488-489.

Añadió que "[l]a Ley Núm. 75 fue diseñada con el propósito expreso de proteger los derechos legítimos de los distribuidores y remediar los perjuicios causados a estos". *Íd.* pág. 489. Esto, como reacción a las prácticas abusivas de aquellos principales "que, sin justa causa, menoscaban arbitrariamente las relaciones contractuales con los distribuidores, tan pronto estos crean un mercado favorable a sus productos y servicios". *Íd.*

Por otro lado, el Artículo 1 (a) de la Ley Núm. 75, 10 LPRA sec. 278, define distribuidor como la "persona realmente interesada en un contrato de distribución por tener efectivamente a su cargo en Puerto Rico la distribución, agencia, concesión o representación de determinada mercancía o servicio". Por su parte, su inciso (b) define "contrato de distribución" como la "relación establecida entre un distribuidor y un principal o concedente, mediante la cual, e irrespectivamente de la forma en que las partes denominen, caractericen o formalicen dicha relación, el primero se hace real y efectivamente cargo de la distribución de una mercancía, o de la prestación de un servicio mediante concesión o franquicia, en el mercado de Puerto Rico". *Íd.* El inciso (c) define "principal

o concedente" como la "persona que otorga un contrato de distribución con un distribuidor". *Íd.*

En armonía con la política pública aludida, la Ley Núm. 75 creó "una causa de acción a favor de los distribuidores para detener el incumplimiento del principal y ser compensados en daños cuando, luego de introducir productos en el mercado y lograr su reconocimiento social y ventas suficientes, son despojados, sin justa causa, del negocio gestado". (Énfasis nuestro). *Next Step Medical v. Bromedicon et al.*, supra, pág. 489. Por ello, la Ley Núm. 75, *supra*, regula la terminación de los contratos de distribución y provee una causa de acción a favor del distribuidor cuando el principal menoscaba o da por terminado un contrato de distribución sin justa causa. Al respecto, el Artículo 2 del citado estatuto establece que:

> [n]o empece la existencia en un contrato de distribución de una cláusula reservándole[s] a las partes el derecho unilateral a poner fin a la relación existente, ningún principal o concedente podrá dar por terminada dicha relación, o directa o indirectamente realizar acto alguno en menoscabo de la relación establecida, o negarse a renovar dicho contrato a su vencimiento normal, excepto por justa causa. 10 LPRA sec. 278a.

Para propósitos de la Ley Núm. 75, "justa causa" significa "el incumplimiento por el distribuidor de sus obligaciones, o cualquier acción u omisión por parte de éste que afecte en forma adversa y sustancial los intereses del principal o concedente en el desarrollo del mercado o distribución de la mercancía o de los servicios". 10 LPRA sec. 278. Al interpretar la referida definición, en *Warner Lambert Co. v. Tribunal Superior*, 101 DPR 378, 399-400 (1973), nuestro Alto foro indicó lo siguiente:

> Nótese [] que la justa causa se limita a actos imputables al distribuidor. Solamente cuando el distribuidor incurra en incumplimiento de algunas de las condiciones esenciales o afecte adversamente en forma sustancial los intereses del principal, éste puede dar por terminado el contrato sin reparación de daños. No se admite la buena fe del principal en la terminación del contrato, ni su derecho a establecer su propio sistema de distribución o hacer ajustes al sistema de distribución que de buena fe considere necesario para incrementar su mercado.

La definición de justa causa tiene el efecto de privar al principal del derecho de dar por terminado el contrato en cualquier momento. Constituye una modificación sustancial del contrato mediante la cual se transfiere, de un patrimonio a otro, un derecho contractual con un valor económico apreciable. El menoscabo es mayor cuando consideramos que justa causa es una defensa afirmativa, y, como tal, el peso de la prueba recae en el principal. De no existir justa causa, el principal habrá ejecutado un acto torticero contra el distribuidor y deberá indemnizarle a base de una compleja fórmula de daños. *Íd.*

También, el Artículo 2A, 10 LPRA sec. 278a-1 dispone sobre la justa causa que:

(a) No se estimará que constituye justa causa la violación o incumplimiento, por parte del distribuidor, de cualquier disposición incluida en el contrato de distribución para impedir o restringir cambios en la estructura de capital del negocio del distribuidor, o cambios en el control gerencial de dicho negocio, o en los medios o forma de financiamiento de la operación, o para impedir o restringir la libre venta, transferencia o gravamen de cualquier acción corporativa, participación, derecho o interés que tenga cualquier persona en dicho negocio de distribución, a menos que el principal o concedente demuestre que tal incumplimiento pueda afectar o real y efectivamente ha afectado, en forma adversa y sustancial, los intereses de dicho principal o concedente en el desarrollo del mercado, distribución de la mercancía o prestación de los servicios.

(b) Se presumirá, salvo prueba en contrario, que un principal o concedente ha menoscabado la relación establecida en cualquiera de los siguientes casos: (1) Cuando el principal o concedente establece en Puerto Rico facilidades para la distribución directa de mercancía o la prestación de servicios que previamente han estado a cargo del distribuidor; (2) cuando el principal o concedente establece una relación de distribución con uno o más distribuidores adicionales para el área de Puerto Rico, o cualquier parte de dicha área contrario al contrato existente entre las partes; (3) cuando el principal o concedente rehúsa u omite servir injustificadamente al distribuidor las órdenes de mercancía que éste le envía, en cantidades razonables y dentro de un tiempo razonable; (4) cuando el principal o concedente unilateralmente y en forma irrazonable varía, en perjuicio del distribuidor, los métodos de embarque, o la forma o condiciones o términos de pago por la mercancía ordenada.

(c) No se estimará que constituye justa causa la violación o incumplimiento, por parte del distribuidor, de cualquier disposición incluida en el contrato de distribución fijando cánones de conducta, o cuotas o metas de distribución, por no ajustarse a las realidades del mercado de Puerto Rico en el momento de la violación o incumplimiento por parte del distribuidor. El peso de la prueba para demostrar la razonabilidad del canon de conducta o de la cuota o meta fijada recaerá sobre el principal o concedente.

Entonces, de no existir justa causa para la terminación del contrato de distribución, para el menoscabo de la relación establecida, o para la negativa a renovar dicho contrato, el Artículo 3, 10 LPRA sec. 278b dispone que el principal habrá ejecutado un acto torticero contra el distribuidor, por lo que deberá indemnizarle en la medida de los daños que le cause.

En lo pertinente al asunto del derecho de exclusividad en la distribución, en *Next Step Medical v. Bromedicon,* supra, pág. 494, el Tribunal Supremo resolvió lo siguiente:

> es menester puntualizar que el legislador, al definir un contrato de distribución para efectos de la Ley de Contratos de Distribución de 1964, **no circunscribió la aplicación del estatuto a los contratos de distribución exclusiva**. Es decir, no se requiere exclusividad en la distribución de un producto o prestación de un servicio como requisito para ser acreedor de los remedios establecidos en el estatuto. Esto, pues, la aludida ley hace referencia a los contratos de distribución en general. (Énfasis provisto).

Las expresiones anteriores son cónsonas con las de *Roberco, Inc. y Colon v. Oxford Inds., Inc.,* 122 DPR 115, 124 (1988) donde el Tribunal Supremo, citando a *J. Soler Motors v. Kaiser Jeep Int'l,* 108 DPR 134 (1978), precisó que la exclusividad en la distribución de un producto o prestación de un servicio no es requisito indispensable para cualificar como un distribuidor bajo la Ley Núm. 75.

En definitiva, "todo distribuidor que sea parte en un contrato de distribución, sea o no éste de carácter exclusivo, tendrá una causa de acción contra el principal que menoscabe o termine el contrato sin justa causa". *Puerto Rico Oil Co., Inc. v. Dayco Prod., Inc.,* 164 DPR 486, 502 (2005).

Por otra parte, el Artículo 3, 10 LPRA sec. 278b, establece los factores a considerarse al fijar la cuantía de los posibles daños que se pueden reclamar cuando se determine que no hubo justa causa para la terminación o el menoscabo del contrato, entre ellos: (d) [e]l monto de los beneficios que se hayan obtenido en la distribución de la mercancía o en la prestación de los servicios, según sea el caso, durante los últimos cinco

años o si no llegaren a cinco, cinco veces el promedio de los beneficios anuales obtenidos durante los últimos años, cualesquiera que fuesen. El referido inciso del Artículo 3, *Íd.*, ha sido interpretado por el Tribunal de Distrito como que permite que se indemnice por la pérdida de ganancias. *A.M. Capen's Co. v. American Trading & Prod. Corp.*, 973 F. Supp. 247 (1997). Por lo tanto, su aplicación "depende de anteriores ganancias solamente como una manera de predecir las ganancias futuras. *A.M. Capen's Co. v. American Trading & Prod. Corp.*, 973 F. Supp. 247 (1997).

Por último, toda acción derivada de la Ley Núm. 75, *supra,* "prescribirá a los tres años a contar desde la fecha de la terminación definitiva del contrato de distribución, o de la realización de los actos de menoscabo, según sea el caso". 10 LPRA sec. 278d. Como es sabido, la prescripción extintiva es un modo de extinción de los derechos que finaliza el derecho a ejercer determinada causa de acción. *Cacho González et al. v. Santarrosa et al.*, 203 DPR 215, 228 (2019). Resulta de la ausencia de algún acto interruptor durante el plazo marcado por la ley y se fundamenta en la necesidad de que haya estabilidad en las relaciones y seguridad en el tráfico jurídico. *Íd.*

Sobre la prescripción de las acciones instadas al amparo de la Ley Núm. 75, en *Pacheco v. Nat'l W. Life Ins. Co.*, 122 DPR 55, 67 (1988), el Tribunal Supremo resolvió lo siguiente:

> …por ser la Ley Núm. 75, *supra*, de carácter mercantil, que regula la terminación o menoscabo del contrato de distribución entre los principales y sus distribuidores, la acción indemnizatoria resultante es también de la misma naturaleza y, de forma supletoria, le son aplicables las disposiciones del Código de Comercio relativas a la interrupción de la prescripción. Las reclamaciones extrajudiciales no interrumpen el término prescriptivo de tres (3) años del Art. 5 de la Ley Núm. 75, supra, 10 L.P.R.A. sec. 278d. *Íd.*

## III. Aplicación del Derecho a los hechos

### a.

La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, establece, en lo pertinente, que mediante el recurso de *certiorari* podrá

solicitarse la revisión de resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, cuando se recurre de: (1) una resolución u orden bajo la Regla 56 (Remedios Provisionales) y la Regla 57 (*Injunction*) de Procedimiento Civil; (2) **la denegatoria de una moción de carácter dispositivo**. (Énfasis provisto). Precisamente, se nos ha solicitado la revocación de una *Resolución* denegatoria de una moción dispositiva, la moción de sentencia sumaria instada por la parte peticionaria, lo que nos coloca en posición de ejercer nuestra discreción para determinar si expedimos o no el recurso discrecional solicitado.

b.

Ante una *Resolución* denegatoria de moción de sentencia sumaria, debemos determinar de manera inicial si las partes cumplieron con los requisitos que impone la Regla 36 de Procedimiento Civil, *supra*, para colocarnos en posición de considerarla. *Meléndez González et al. v. M. Cuebas*, supra. Por un lado, juzgamos que la solicitud de sentencia sumaria presentada por VS, cumplió sustancialmente con los requisitos que exige la regla procesal aludida. Es decir, expuso brevemente las alegaciones de las partes, estableció las controversias sobre las cuales se solicita sentencia sumaria, incluyó un listado de hechos no controvertidos, desglosándolos en párrafos debidamente numerados, y para cada uno de ellos, especificó la prueba admisible que los apoyaban. No obstante, omitió **indicar los párrafos o las páginas específicas** de la declaración jurada y la otra prueba admisible en evidencia donde se establecen los hechos.

Por su parte, la *Oposición a Sentencia Sumaria* presentada por HAM también cumplió sustancialmente con los requisitos de forma que exige la Regla 36(b) de Procedimiento Civil, *supra*. Sin embargo, inició la enumeración desde la comparecencia, cuando la precitada regla exige que se haga referencia específicamente a los hechos **según enumerados por la parte promovente** que considerara realmente controvertidos. Véase *SLG Zapata-Rivera v. J.F. Montalvo,*

supra. Similarmente, los hechos incontrovertidos propuestos por HAM debieron iniciar una nueva numeración, no obstante, esta formalidad fue omitida. Por consiguiente, reiteramos las expresiones de nuestro Tribunal Supremo en cuanto a que "[l]a numeración no es un mero formalismo, ni constituye un simple requisito mecánico sin sentido". *SLG Zapata-Rivera v. J.F. Montalvo*, pág. 434. Por el contrario, tiene como propósito facilitar y agilizar la labor adjudicativa al ponernos en posición de evaluar las versiones de hechos encontradas. *Íd.*

A pesar de lo señalado, reiteramos que, en tanto ambas partes cumplieron sustancialmente con los requisitos que gobiernan el trámite de una petición de sentencia sumaria, juzgamos que estamos en posición de entrar en los méritos del asunto planteado.

c.

Entonces, habiendo examinado *de novo* el expediente y la prueba documental allí incluida, hemos concluido que coincidimos con los hechos materiales controvertidos e incontrovertidos enumerados por el TPI en la *Resolución* recurrida, a excepción de un asunto contenido en el hecho incontrovertido número 4, que detallamos.[2] En específico, aunque coincidimos con el foro recurrido al haber identificado como un hecho incontrovertido medular que el 18 de marzo de 2015 HAM había informado a VS que estaba "de acuerdo con el precio concedido", no obstante juzgamos que continúa en controversia si ello se refería al precio de la compra por adelantado, al de "una paleta a $15.00 el galón y de dos a nueve paletas sigue siendo a $13.00 el galón", o a ambos. Por tanto, el asunto aquí señalado se ha de tomar como que permanece en controversia.

---

[2] Según se hizo constar en la *Resolución* recurrida, tal hecho es el siguiente: "El 18 de marzo de 2015 HAM informó a VS que estaba "de acuerdo con el precio concedido", accediendo así a los precios impuestos por VS". Apéndice el recurso de *certiorari*, página 216.

d.

Establecidas las bases fácticas incontrovertidas, podemos dirigir la mirada a la aplicación del derecho, poniendo atención a la tesis o teoría legal esgrimida por la parte peticionaria para reiterar su solicitud de desestimación sumaria por la presunta prescripción de la causa de acción. El argumento principal de VS descansa en identificar como un hecho incontrovertido el haberle enviado un correo electrónico a HAM el 12 de diciembre de 2017, informándole **el fin de la obligación de distribución exclusiva** que existía entre las partes, (que admitió HAM mediante contestación a través de correo electrónico el 14 de diciembre del mismo año), para desde ahí aseverar que tal fecha marcó el punto de partida para computar el término prescriptivo. Es decir, reitera el peticionario que desde el momento en que HAM **se enteró o conoció que dejaría de ser el distribuidor exclusivo de los productos**, supo del daño que esto causaría a la relación de distribución entre las partes, y se activó en ese momento el término para ejercer la causa de acción. Bajo esta narrativa, el peticionario afirma que la causa de acción al amparo de la Ley Núm. 75 instada en su contra el 28 de julio de 2021, (fecha en que fue traído al pleito como parte demandada, a través de una *Demanda Enmendada*), está prescrita, puesto que habían transcurrido más de tres años desde que terminó el derecho de exclusividad de HAM y se alteraron los términos de la relación de distribución en el 2015.

Sobre lo anterior, iniciamos por zanjar que no hay controversia sobre el hecho de que VS le envió el referido correo electrónico a HAM el 12 de diciembre de 2017, informándole el fin de la obligación de distribución exclusiva que existía entre las partes, y este último recibió dicho mensaje, y lo contestó, pero no le atribuimos el efecto jurídico sobre el término prescriptivo que el primero nos llama a reconocer. Para explicar por qué así lo afirmamos, antes conviene reiterar algunos de los principios de derecho que acompañan la interpretación de la Ley Núm. 75.

La Ley Núm. 75 implanta una fuerte política pública de armonizar los intereses y nivelar las condiciones de contratación de dos partes económicamente dispares, que se vinculan a través de una relación de índole comercial que involucra la distribución. *Next Step Medical v. Bromedicon*, supra, pág. 488. Particularmente, la Ley Núm. 75, *supra*, fue diseñada con el **propósito expreso de proteger los derechos legítimos de los distribuidores y remediar los perjuicios causados a estos** al estabilizar las relaciones de distribución en Puerto Rico. Además, tuvo como propósito erradicar ciertas prácticas abusivas como sucede en los casos en que, sin causa justificada, se eliminan distribuidores, concesionarios o agentes, o se van gradualmente mermando y menoscabando el alcance de las relaciones previamente establecidas. *Íd.* Véase también Exposición de Motivos Ley Núm. 75, supra.

En función de lo anterior, la referida Ley crea una causa de acción **a favor de los distribuidores** cuando **el principal** menoscaba o da por terminado un contrato de distribución sin justa causa. *Next Step Medical v. Bromedicon et al.*, supra. Específicamente, el Art. 3 de la Ley Núm. 75, *supra*, establece la aludida causa de acción. En lo pertinente, establece que, en ausencia de justa causa para el menoscabo de la relación establecida, el principal habrá ejecutado un acto torticero contra el distribuidor y deberá indemnizarle en la medida de los daños que le cause. *Íd.*

El Art. 1 (d) de la Ley Núm. 75, *supra*, define el concepto "justa causa" como el incumplimiento de alguna de las obligaciones esenciales del contrato de distribución, por parte del distribuidor, o cualquier acción u omisión por parte de éste que afecte adversamente y en forma sustancial los intereses del principal o concedente en el desarrollo del mercado o distribución de la mercancía o servicios. En otras palabras, "la justa causa se limita a actos imputables al distribuidor. Solamente cuando el distribuidor incurra en incumplimiento de algunas de las condiciones

esenciales o afecte adversamente en forma sustancial los intereses del principal, éste puede dar por terminado el contrato sin reparación de daños". *Warner Lambert Co. v. Tribunal Superior*, supra.

En mérito de lo anterior, la propia Ley Núm. 75 en su Art. 2A, *supra,* provee los siguientes ejemplos de lo que constituye un menoscabo de la relación establecida.

> ....(b) Se presumirá, salvo prueba en contrario, que un principal o concedente ha menoscabado la relación establecida en cualquiera de los siguientes casos: (1) Cuando el principal o concedente establece en Puerto Rico facilidades para la distribución directa de mercancía o la prestación de servicios que previamente han estado a cargo del distribuidor; (2) cuando el principal o concedente establece una relación de distribución con uno o más distribuidores adicionales para el área de Puerto Rico, o cualquier parte de dicha área contrario al contrato existente entre las partes; (3) cuando el principal o concedente rehúsa u omite servir injustificadamente al distribuidor las órdenes de mercancía que éste le envía, en cantidades razonables y dentro de un tiempo razonable; (4) cuando el principal o concedente unilateralmente y en forma irrazonable varía, en perjuicio del distribuidor, los métodos de embarque, o la forma o condiciones o términos de pago por la mercancía ordenada.

Nos hemos extendido en la citación de derecho que antecede con el propósito de resaltar que **ninguna de dichas disposiciones legales limita la presunción de menoscabo a la existencia de una relación de exclusividad entre el distribuidor y el principal**. En reconocimiento a ello, nuestro Tribunal Supremo resolvió en *Next Step Med. v. Bromedicon*, supra, que "[t]odo distribuidor que sea parte en un contrato de distribución, **sea o no de carácter exclusivo, tendrá una causa de acción contra el principal que menoscabe o termine el contrato sin justa causa**". (Énfasis y subrayado provistos). Consecuentemente, "**un distribuidor no exclusivo está cobijado a los fines de las disposiciones de la Ley de Contratos de Distribución de 1964**". *Íd.* (Énfasis provisto).

De lo anterior se sigue que **la existencia de la relación comercial de naturaleza exclusiva no es determinante para que el distribuidor tenga una causa de acción al amparo de la Ley Núm. 75**. Esto es, partiendo de la premisa de que la relación comercial fue exclusiva inicialmente, la violación al derecho de exclusividad puede constituir un menoscabo de la relación establecida al amparo de la Ley Núm. 75. **Sin**

**embargo, en el caso en que las relaciones comerciales continúen una vez culminó la exclusividad, el distribuidor puede tener una causa de acción cuando, en ausencia de justa causa, se menoscabe la relación que subsiste.** Es precisamente este último asunto medular que continúa en controversia en el caso ante nuestra consideración y no permite disponer de la controversia sobre prescripción de manera sumaria.

HAM niega que la relación de distribución exclusiva habida con VS perdiera tal carácter, en tanto el comportamiento de las partes luego de recibido el correo electrónico de 12 de diciembre de 2017 demuestra que mantuvieron y respetaron la exclusividad pactada hasta el 2020, cuando intervino Motopac. En este sentido, HAM afirma que las relaciones de distribución con VS continuaron, a pesar de lo indicado en el referido correo electrónico. Por lo tanto, alega que los menoscabos alegados ocurrieron a partir del año 2020 y que la *Demanda Enmendada* fue oportuna al ser radicada el 28 de julio de 2021, dentro del término de tres años concebido por la Ley Núm. 75.

En consonancia con lo explicado, al computar el término prescriptivo **también se debe evaluar el comportamiento posterior de las partes** ante la posibilidad de que ocurra una de dos cosas. La primera, que, aun cuando existe una notificación dando por terminada la exclusividad, puede sostenerse una relación comercial de distribución exclusiva *de facto,* ante lo cual no cabría hablar del inicio del término prescriptivo por menoscabo de la exclusividad sino hasta su **terminación definitiva** o hasta que se produzca **cualquier otro menoscabo** de dicha relación, según las circunstancias particulares de cada caso. El segundo escenario ocurriría cuando, a pesar de que la relación comercial de exclusividad culminó, se mantuvieron relaciones comerciales **no exclusivas** entre el principal y el distribuidor. En ese caso, reiteramos, el distribuidor conserva una causa de acción **por el menoscabo de la relación contractual existente, independiente de la exclusividad.** Por

lo tanto, se iniciaría un nuevo término prescriptivo a partir de los actos de menoscabo de la relación que subsiste.

Por tanto, no podemos concluir que cuando existe una relación de distribución exclusiva el mero anuncio del fin de la exclusividad priva al distribuidor de toda causa de acción por prescripción cuando mantienen relaciones comerciales posteriormente. Dejar de tomar en consideración los actos posteriores a la notificación de la conclusión de la relación comercial exclusiva frustraría los propósitos de la Ley Núm. 75 esbozados, en detrimento de los distribuidores locales que a través de su gestión empresarial logran establecer un mercado, mientras que permite prácticas abusivas de los principales. Contrario a lo que afirma la parte peticionaria en su recurso, la documentación ante nosotros no resulta suficiente para descartar que tal relación prevaleciera más allá de la fecha en que del correo electrónico de 12 de diciembre de 2017, por lo que sigue siendo un hecho medular que merece ser dilucidado a través de juicio plenario.

Por último, no pasaremos juicio sobre si las reclamaciones de dolo e incumplimiento contractual al amparo del Código Civil de Puerto Rico, Ley 55-2020, según enmendada, 31 LPRA sec. 5311 *et seq.*, proceden o no puesto que no fueron parte de la *Resolución* cuya revisión se nos solicita. El único error planteado por VS no fue cometido.

## IV. Parte dispositiva

Por los fundamentos que anteceden, expedimos el recurso de *certiorari* y confirmamos la *Resolución* recurrida.

Lo acordó el Tribunal y lo certifica su Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones